Hazel Kinchen HALL *v.* RENTAL MANAGEMENT, INC.

95-871                                           913 S.W.2d 293

Supreme Court of Arkansas
Opinion delivered January 22, 1996

*Dodds, Kidd, Ryan & Moore*, by: *Robert T. James*, for appellant.

*Huckabay, Munson, Rowlett & Tilley, P.A.*, by: *Mike Huckabay* and *Julia Busfield*, for appellee.

BRADLEY D. JESSON, Chief Justice. This case concerns the duty of a landlord to protect its tenants from the criminal acts of third persons. The appellant, Hazel Kinchen Hall, and her son, seventeen-year-old Kendall Dolls, were tenants in the Jefferson Manor Apartments. The apartments were operated by the appellee, Rental Management, Inc. (RMI). On July 12, 1991, Kendall Dolls was shot and killed on the premises. The perpetrator, a man named Geno Davis, was the guest of another resident. Mrs. Hall filed suit in 1994 alleging that the negligence of RMI had proximately caused her son's death. A motion for summary judgment was filed by RMI and was granted by the trial court. We find no error and affirm.

On the night of the shooting, Kendall Dolls left his apartment and went to an area of the complex where an activity for young people had been taking place. The record does not reflect exactly what took place, but it appears Kendall was shot without provocation by Geno Davis. In her complaint, Mrs. Hall alleged that RMI had failed to provide adequate security measures to ward off criminal attacks and in particular had used unqualified personnel as security.

After substantial discovery had taken place, RMI filed a motion for summary judgment on the basis that a landlord owes no duty to protect its tenants from the criminal acts of third persons. A copy of Mrs. Hall's lease agreement was attached as an exhibit to the motion. The lease contained no provision in which RMI agreed to provide Mrs. Hall security against criminal activities. Mrs. Hall responded to the motion by acknowledging that, as a general rule, landlords have no duty to offer such protection to their tenants. However, she claimed, RMI voluntarily undertook a duty to provide security and, having done so, was bound to use reasonable care. To show that RMI had assumed this duty, she attached the following exhibits:[1]

1. *The Good Neighbor Handbook.* Paragraph 14 of the lease agreement stated that tenants would abide by the House Rules as set forth in the Handbook.

2. *A portion of RMI's Employee Procedures Manual.* The manual contained sections entitled "Security" and "Security Patrol."

3. *Deposition testimony of Chuck Needs.* Mr. Needs was a maintenance man at the complex.

According to Mrs. Hall, each of these exhibits contained evidence that RMI had assumed the duty to provide its tenants with protection against criminal activity. The following are the relevant portions of the exhibits.

### The Good Neighbor Handbook

Under a section titled "SECURITY," the following paragraph appears:

A feeling of security is important to all residents. If you notice any unusual or suspicious activity, please notify the Resident Manager immediately. All residents are asked to cooperate when seeing abuse to anyone or to the property. Do not open the door to anyone unless you know who it

---

[1] Appellant attached a number of exhibits to her response, but only three are abstracted. We will consider only those exhibits which are abstracted. See *Columbia Mut. Ins. Co.* v. *Patterson*, 320 Ark. 584, 899 S.W.2d 61 (1995); *Rowe* v. *Druyvesteyn Constr. Co.*, 253 Ark. 67, 484 S.W.2d 512 (1972).

is. If you are in doubt, call the management if necessary.

The following provisions are included in a section titled "HOUSE RULES":

> The management cannot be responsible for your children in the event of parent negligence. We can only see that the grounds and apartment are a safe place to live; but without a parent, it becomes very unsafe and threatens the life of your child.

> Because of management's concern for safety and your peace of mind, children under school age cannot be allowed in public areas such as laundry, office or recreation room, unless accompanied by a parent or guardian.

> ****

> You have the same privacy as if your apartment were a separate home. Each tenant has that same right of privacy and peaceful enjoyment. Since the apartments are close together, you must think of the other people who live next door to you. To give your neighbors the privacy that they deserve, we ask that your children do not play outside beyond the time of 9:00 p.m. each evening.

### Employee Procedures Manual

The manual as a whole deals with many aspects of apartment living such as lock-outs, visitors, keys, pets, and fire safety. However, three pages of the manual address the subject of security. Under the heading "Security," RMI resident managers are directed to be concerned about the safety factor in apartment living, and told that effective security requires cooperation between management and residents. General security advice is given such as having children play in designated areas; making sure there are no excessive crowds or noise; vehicular control, meaning no large trucks or trailers in parking places, no motorcycles in breezeways, and no disabled vehicles; reminding residents to control their guests; being alert for suspicious activities; and getting acquainted with local law enforcement personnel. The following provisions also appear:

> On-site management will have to recommend to the Property Manager if security officers are needed. It is most

important that ALL on-site personnel be security and safety conscious at all times.

\*\*\*\*

Security patrol may be performed by employees to check the property in the evenings. A regular check will ward off problems and inform the management of any unusual activity.

RMI employees must:
Conduct themselves, at all times, in a helpful, friendly, yet business-like manner with all residents and guests. This will give the residents a sense of well-being. A business and no-nonsense approach will let them know that we take our jobs seriously and that the welfare of the residents is very important to all employees.

\*\*\*\*

Any person on the property that is not a resident or guest is considered trespassing. If there is any cause for concern, call the police. In any event, ask the person if we can help or give directions. A person must have legitimate business to be on the property. If the person has no business on the property, they must be asked politely to leave. Again, if there is cause for concern, CALL THE POLICE. Obtain the person's name. If possible, obtain the license number of the car. Keep this information on record for future reference.

Under the heading "Security Patrol," the following appears:

Crime is a major worry for residents and there is no substitute for having the property patrolled by well-trained people, whether by our own employees or professional security personnel. Strict management of tenants behavior and the behavior of guests make it clear from the start that the property is a no-nonsense place. Adhering to strict policy will not be attractive to those who just want to 'hang out.' 'Hanging out' will not be tolerated. This is the beginning of major problems.

Activities that are disturbing and impose on the rights of others will not be tolerated, not only from residents but

from others. Activity of this type must never be allowed to get started. Our reputation will serve as some type of security measure.

Residents may blame the management for failing to provide security or for providing it negligently. Legal liability for negligence may perhaps be reduced by hiring an outside Security Patrol.

If there is a problem with security, the resident must contact the RMI office. We will be happy to go to any length to correct the problem.

It is our goal to at all times provide a safe place for our residents and family. We feel our residents have the right to be safe and live in a peaceful environment.

### Deposition of Chuck Needs

On the date of the shooting, the resident manager was on vacation. Mr. Needs, the maintenance man, was left to respond to maintenance calls, check the lights, and help with the youth activity center. The complex employed no security guards. Either Mr. Needs or the manager would patrol the premises, especially if residents called and said they heard a noise, for example. In such a case, Mr. Needs would look around the area. If he saw some evidence, such as footprints, that a person had been outside an apartment, he would make a record of the incident. The steps the complex might take as part of security were checking the lighting, responding to tenant calls and making the rounds to check playgrounds, porches, and driveways. If, for example, a tenant saw a person with a gun, the tenant might call him and he would call the police.

After a hearing, the trial judge granted the motion for summary judgment. He relied on our recent decision of *Bartley* v. *Sweetser*, 319 Ark. 117, 890 S.W.2d 250 (1994), and found that the activities of RMI in making some efforts toward safety did not create a duty to provide security against the criminal acts of others. Mrs. Hall appeals from that ruling.

■ This is the type of issue which is properly decided by summary judgment. It involves the question of whether a duty exists. This is always a question of law, not to be decided by a

trier of fact. *First Commercial Trust Co.* v. *Lorcin Eng'g*, 321 Ark. 210, 900 S.W.2d 202 (1995).

■ Our most recent case concerning the duty of a landlord in these circumstances is *Bartley* v. *Sweetser, supra.* In that case, two men entered a tenant's apartment and raped her. The tenant sued her landlord claiming that the landlord provided her with a windowless door with a simple push-button lock, failed to provide adequate security and adequate lighting of the common areas, and failed to warn her that the complex was prone to criminal activity. The trial court granted summary judgment in favor of the landlord and we affirmed. In our affirmance, we recognized the general rule that a landlord does not owe a duty to protect the tenant from criminal acts. However, the appellant alleges that the activities undertaken by RMI remove this case from the rubric of *Bartley*. She argues that RMI voluntarily undertook to provide security, thereby becoming liable for any negligence in doing so.

■ We have implied that a landlord who assumes a duty not required of him is removed from the general rule. See *Glasgow* v. *Century Property Fund XIX*, 299 Ark. 221, 772 S.W.2d 312 (1989) and *Kilbury* v. *McConnell*, 246 Ark. 528, 438 S.W.2d 692 (1969) where we said that there was no evidence of "an agreement or *assumption of duty* that removes the landlord from the general rule." (Emphasis added.) Indeed, this principle is widely recognized. R. Schoshinski *American Law of Landlord & Tenant*, § 4:15 (Supp. 1995); *Walls* v. *Oxford Management Co.*, 137 N.H. 653, 633 A.2d 103 (1993); *Feld* v. *Merriam*, 506 Pa. 383, 485 A.2d 742 (1984); *Hill* v. *Chicago Housing Authority*, 233 Ill. App. 3d 923, 599 N.E.2d 1118 (1992). So, the question left to us is whether RMI has removed itself from the general rule and assumed a duty to protect its tenants from criminal attacks. The answer is no.

■ The provisions of the handbook and the procedures manual, along with the deposition testimony of Chuck Needs reflect that RMI had a concern for the general welfare of its tenants, and a desire to keep on-site management informed of the activities taking place on the grounds. Its implementation of certain practices such as lighting, evening patrols, and communicating with residents regarding suspicious activities help assure the

quiet enjoyment and basic safety of the tenants, in addition to providing a modicum of deterrence to criminal activity. We are reluctant to hold that a landlord's use of these modest, conscientious measures imposes a full-blown duty to protect tenants from third-party criminal activities.

The Alabama Supreme Court faced a similar issue in the case of *Dailey* v. *Housing Authority for the Birmingham Dist.*, 639 So.2d 1343 (1994). There, the tenant argued that certain provisions in a procedures manual, similar to those here, and the hiring of a guard to patrol the grounds, gave rise to a duty to protect tenants from criminal attacks. The court said the following:

> all that the quoted statements from the documents and the HABD's hiring of a security guard indicate is an attempt by HABD to discourage crime in the Metropolitan Gardens area, not a voluntary assumption of a duty to provide [the tenant] with protection from all criminal acts. We find the actions of HABD to be commendable, both in hiring security personnel and in setting out in writing those persons' duties and roles. HABD was attempting to reduce the occurrence of crime in the Metropolitan Gardens neighborhood and to alleviate the fears and anxieties of its tenants.

The provisions undertaken by RMI in this case do not rise to such a level that RMI has assumed a duty to protect its tenants from criminal attacks by third parties. Therefore, we hold that this case is controlled by the general rule enunciated in *Bartley* v. *Sweetser.*

Affirmed.