Janice FUNCHESS, Trustee for
the Heirs of J.W. Haynes,
decedent, Respondent,

v.

CECIL NEWMAN CORP., et al.,
Petitioner, Appellants.

No. C8–00–90.

Supreme Court of Minnesota.

Aug. 23, 2001.

William F. Mohrman, Mohrman & Kaardal, P.A., Minneapolis, for appellant.

John O. Murrin, Christopher A. LaNave, Murrin Law Firm, Edina, for respondent.

Rebecca L. Rom, Chad M. Oldfather, Faegre & Benson, LLP, Minneapolis, for amicus curiae, Family Housing Fund.

Ann E. Juergens, William Mitchell Law Clinic, St. Paul, for amicus curiae, Mid–Minnesota Legal Assistant, Inc.

John G. Horner, Horner Law Office, Savage, for amicus curiae, Minnesota Multi–Housing Association.

## OPINION

LANCASTER, Justice.

At approximately 11 p.m. on May 12, 1995, three unidentified intruders entered the apartment leased by J.W. Haynes, Jr. at the Cecil Newman Plaza apartment complex and shot Haynes, killing him. The killers were never apprehended. Respondent Janice Funchess, Haynes' mother and trustee for his heirs, filed suit alleging that Haynes' death resulted from negligence by appellants Cecil Newman Corporation and Gravzy Group LLC (collectively, Newman/Gravzy), owner and management company, respectively, of Cecil Newman Plaza. The district court granted Newman/Gravzy's motion for summary judgment, concluding that they had no duty to protect Haynes from the criminal acts of third parties. The court of appeals reversed and remanded, holding that the defendants owed common law, statutory, and contractual duties to Haynes, and that there were genuine is-

sues of material fact regarding breach of duty and proximate cause. We reverse.

In early April 1995, J.W. Haynes and his girlfriend, Angela Bennett, leased a unit in an apartment building that is part of the Cecil Newman Plaza apartment complex in Minneapolis. The apartment building had two floors, each with four apartments and a hallway running down its center. The entrance to each apartment was a metal door in a metal frame, inserted into a concrete block wall, and the apartment door had a deadbolt lock and a peephole into the hallway. Each apartment also had a buzzer/intercom system linked to the front security door that allowed visitors to buzz a given apartment and talk with the resident over the intercom. The resident could then, by pushing a button, unlock the front security door and admit the visitor into the apartment building ("buzzing" the guest into the apartment building).

The entrances to the buildings at Cecil Newman Plaza have existed in two designs. Which design was in place on May 12, 1995, is an undetermined question of fact. In the older design, the front entrance had a see-through thick glass door that opened from the outside into a vestibule that contained another thick glass door—the security door. This inner security door had a keyed lock; a buzzer/intercom box was located next to the door. The rear entrance was designed in the same manner but had no buzzer/intercom box. The newer design eliminates the vestibule and internal door: there is a single locked security door at each entrance that opens directly to the outside. In this new design, the buzzer/intercom is located next to the front security door, on the exterior wall of the apartment building. The new

and old designs both have windows above and along the side of the exterior door that allow outside observers to see into the hallways. Once inside either security door, in either design, entrants ascend a short stairway to the first level. The stairway continues to the second floor. For an entrant through the front door of the building, Haynes' apartment was the first door on the left on the first floor.

Haynes' mother and his two sisters filed affidavits stating that they visited Haynes' apartment several times before his death and that in the weeks prior to May 12 they were all able to open both the rear external door and the rear internal (security) door without help and without a key. In her affidavit, one of Haynes' sisters states that on May 12 she was twice able to step through (without opening) the rear external door, which had glass broken out of it, then pull open the rear security door without using a key or having it opened for her. Bennett states in her affidavit that for three weeks before May 12, and "on May 12, 1995 prior to 10 p.m." the rear security door could be opened without a key. All of these affiants state that on none of these occasions were there objects propping or holding open the rear internal security door.[1]

Bennett states in her affidavit that beginning approximately a month before Haynes' death the intercom portion of the intercom/buzzer system in their apartment did not work correctly. Bennett and Haynes could hear people buzz their apartment and could open the front security door from the panel in their apartment, but they could not communicate with visitors over the intercom. Bennett states in her affidavit that she reported the problem

---

1. Randy Gott, a private security officer who worked at Cecil Newman Plaza at the time of Haynes' death, states in his affidavit that it was not unusual for tenants to prop open the security doors with a rock, brick, or other item, and that on his rounds he would check to see whether the security doors were locked or propped open.

to a maintenance person and understood that the intercom would be fixed. For purposes of their summary judgment motion, Newman/Gravzy accept the allegation that the intercom system in the Haynes apartment did not function properly.

Section ten of the Cecil Newman Plaza lease agreement signed by Haynes and Bennett provides, among other things, that the landlord agrees to "maintain the common areas and facilities in safe condition" and to "make necessary repairs with reasonable promptness." Bennett states in her affidavit that she read this section of the lease and believed that it required the landlord to maintain and repair the existing security measures. Accordingly, she and Haynes expected the security doors to work properly and she expected that the rear security door would be fixed.

Funchess submitted the affidavit of David Rumpza, a 28–year veteran of the Minneapolis Police Department, in which Rumpza stated that the area surrounding Haynes' apartment building was considered a high crime area from 1992 to July 26, 1999, the date of the affidavit.[2] Officer Rumpza's affidavit also offers his opinion that a security door that could be opened without a key would increase the "likelihood of crime, including violent crime," in the building.

Randy Gott was hired as a private security officer to provide security at Cecil Newman Plaza; he was on duty on the evening of May 12, 1995. Gott made his rounds that evening, and to his best recollection both security doors on Haynes' apartment building were locked and working. He does not recall any glass broken or missing from the security doors that night. At approximately 11 p.m. Gott observed three men running from Haynes'

apartment building. He chased the men, but they escaped. Gott returned to the apartment complex and, along with some police officers who arrived shortly thereafter, he entered Haynes' apartment. Gott and the police who were at the scene concur that there were no signs of forced entry into the apartment.

Bennett witnessed the homicide and was interviewed by the police. An investigating officer states in an affidavit that Bennett told the police that Haynes had buzzed into the building the men who later murdered him and had opened the door to the apartment to let them in. In her own affidavit, Bennett states that Haynes did not buzz anyone in. She states that Haynes "was going outside to do something or look to see who had buzzed our apartment (since we could not talk through our intercom or listen through our intercom)" when she saw someone force an arm through the narrow opening at the door. Three men then forced their way into the apartment and one of the men shot Haynes. Bennett states in her affidavit that the men must have come through the back door, as the front security door was working properly and could be opened only by key.

Bennett attributes the discrepancy between her affidavit and what she told the police as to whether or not Haynes had buzzed anyone into the building to the fact that she was interviewed by the police about an hour after the shooting she had witnessed:

> I was in shock, I was scared * * *. I was in a "trance", confused. * * * I kept asking the police if [Haynes] was dead. * * * I believe I did mention to the police about buzzing people in that

---

**2.** Reports of police calls from the Cecil Newman Plaza complex from 1992–95 show eight calls reporting a shooting victim (two in Haynes' apartment building) and dozens of calls reporting assaults, people with weapons, and other serious crimes.

night * * * but I was referring to earlier times that night when we had buzzed people in. Maybe I was not clear or they misunderstood me or I misunderstood their questions. I had never been in a situation like that before * * *. I was too shook up to deal with the situation very well.

As trustee for Haynes' heirs, Funchess filed suit alleging that Newman/Gravzy were negligent in their failure to repair the broken security door and intercom system and that this negligence, which allowed the killers to enter the building and Haynes' apartment, resulted in Haynes' death. Newman/Gravzy moved for summary judgment, claiming that Funchess could not establish facts demonstrating that Newman/Gravzy owed a duty to Haynes, breached any such duty, or, if any duty existed and was breached, that the murder did not result from an intervening cause. They argued that for Funchess to establish a duty to protect, she had to show there was a special relationship between Haynes and Newman/Gravzy and that Haynes' death was a foreseeable result of the breach of any such duty. In addition, Newman/Gravzy argued that Funchess was required to offer specific evidence showing that the broken intercom system and allegedly broken lock on the rear security door had actually played a role in Haynes' death. Funchess argued that Newman/Gravzy had breached a duty to repair the rear security door lock and the intercom in the Haynes/Bennett apartment. She also argued that she need not establish actual, but only proximate, causation and laid out a possible causal chain linking a failure to repair the security door and intercom to Haynes' death: Some or all of Haynes' attackers entered the building through the broken door and, when the broken intercom forced Haynes to open his apartment door to see who had buzzed him from the front door, the attackers forced their way into Haynes' apartment and fatally shot him.

The district court held that the evidence in this case established no special relationship between Haynes and Newman/Gravzy, and therefore, no duty to protect. Because the district court found no special relationship between Haynes and Newman/Gravzy, it did not address the question of foreseeability.

Funchess appealed and a split panel of the court of appeals reversed, concluding on two theories that Newman/Gravzy owed a common law duty to Haynes. *Funchess v. Cecil Newman Corp.*, 615 N.W.2d 397, 401 (Minn.App.2000). First, the court held that there was a special relationship between Haynes and Newman/Gravzy that imposed upon Newman/Gravzy a duty to use reasonable care in preventing foreseeable criminal acts of third parties. *Id.* Second, the court held that Newman/Gravzy had assumed a duty to maintain the security measures it had already put in place for its tenants, including the locking mechanism of the rear security door. *Id.* The court held that under either of these duties there remained genuine issues of material fact that made summary judgment inappropriate. *Id.*

In addition to concluding that Newman/Gravzy owed Haynes a common law duty, the court of appeals held that Newman/Gravzy owed Haynes statutory and contractual duties that required trial. *Id.* at 401–03. The court held that Newman/Gravzy owed a statutory duty, based on a Minneapolis housing ordinance, which supported a verdict of negligence should a jury decide that the facts showed breach and causation. *Id.* at 401–02. The court also determined that Newman/Gravzy had a contractual obligation, based on Haynes' lease, to maintain the locks on the doors to Haynes' apartment building in working or-

der. *Id.* at 403. Whether this contractual duty was breached was a question of fact requiring trial.

Finally, the court of appeals rejected Newman/Gravzy's argument that the violent assault on Haynes was an intervening cause that superseded Newman/Gravzy's liability, concluding that the crime was a reasonably foreseeable result of a broken security door on a building in a high crime area. *Id.* at 402–03.

■■■ Summary judgment is appropriate where the record shows there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Minn. R. Civ. P. 56.03. This court reviews a district court's grant of summary judgment to determine whether there are any genuine issues of material fact and whether the lower court erred in its application of law. *H.B. ex rel. Clark v. Whittemore,* 552 N.W.2d 705, 707 (Minn. 1996). On appeal, the evidence is viewed in the light most favorable to the party against whom summary judgment was granted and any doubts about the existence of a material fact are resolved in that party's favor. *Id.* That party, however, cannot defeat a summary judgment motion with unverified and conclusory allegations or by postulating evidence that might be developed at trial. *Lubbers v. Anderson,* 539 N.W.2d 398, 401 (Minn.1995). A defendant in a negligence suit is entitled to summary judgment when the record reflects a complete lack of proof on any of the four essential elements of the negligence claim: (1) the existence of a duty of care, (2) a breach of that duty, (3) an injury, and (4) the breach of the duty being the proximate cause of the injury. *See Lubbers,* 539 N.W.2d at 401.

■■■ The court of appeals concluded that Newman/Gravzy owed several duties to Haynes. Existence of a duty in a negligence case is a question of law. *Clark,* 552 N.W.2d at 707. We consider, in turn, each of the theories of duty in this case.

■■■ First, the court of appeals concluded that Newman/Gravzy had a duty under Minneapolis Code of Ordinances § 244.675 (1998), which requires that exterior doors of apartment buildings like the one in which Haynes lived "be secured by a locking device * * * that will engage and lock automatically when the door is in the closed position" and that the locking devices so required be kept "in a professional state of maintenance and repair." Violation of an ordinance can be negligence per se where the ordinance "imposes a standard of conduct designed to protect the party injured." *Alderman's Inc. v. Shanks,* 536 N.W.2d 4, 7, 8 (Minn.1995).

Newman/Gravzy argue that, because Funchess did not raise the issue of statutory duty in her complaint or in her papers opposing summary judgment, she has not preserved this issue for appeal. In response, Funchess has submitted a supplemental record to this court, consisting of an affidavit by her attorney stating that: (1) a few days before the summary judgment hearing Funchess' attorney both notified Newman/Gravzy's counsel that at the hearing Funchess would be arguing negligence per se under authority of the ordinance and faxed Newman/Gravzy's counsel a copy of the housing ordinance; (2) two days before the hearing, Funchess filed a copy of the ordinance with the district court;[3] and (3) both parties addressed the issue before the district court at the summary judgment hearing.

---

**3.** It is unclear from the record that a copy of the ordinance was filed with the district court. The record supports only that a copy of the ordinance was sent to the judge prior to the summary judgment hearing.

■■ In deciding a matter before it, a reviewing court generally may consider only those issues that the record shows were presented to and considered by the trial court. *Thiele v. Stich,* 425 N.W.2d 580, 582 (Minn.1988). Under the rules of appellate procedure, the record on appeal comprises: "The papers filed in the trial court, the exhibits, and the transcript of the proceedings * * *." Minn. R. Civ. App. P. 110.01. Although a party may submit a supplemental record to provide relevant pieces of the record that are not in the appendices to the briefs, Minn. R. Civ.App. P. 130.03, a party may not change the record itself on appeal. *See Merle's Constr. Co. v. Berg,* 442 N.W.2d 300, 303 (Minn.1989) (striking, on court's own motion, an affidavit added to the record after the court of appeals decision).

In this case, the record before the court of appeals with regard to the statutory duty issue contained no copy of the ordinance and no copy of the hearing transcript at which Funchess alleges the issue was raised. Nor did the record before the court of appeals contain the affidavit from Funchess' attorney. There was no basis in the record for the court of appeals to address the issue of statutory negligence. Accordingly, we hold that Funchess waived the statutory duty issue on appeal.

■■■ The court of appeals also concluded that Newman/Gravzy owed a common law duty to protect Haynes from harm by intruders into his apartment. The general common law rule is that a person has no duty to protect another from harm caused by a third party's con-

duct. *Clark,* 552 N.W.2d at 707; Restatement (Second) of Torts § 314 (1965). There are exceptions to this rule, however, and the general considerations in determining whether one owes a duty to protect another are the relationship of the parties and the foreseeable risk involved. *Erickson v. Curtis Inv. Co.,* 447 N.W.2d 165, 168–69 (Minn.1989); *Lundgren v. Fultz,* 354 N.W.2d 25, 27 (Minn.1984); *see also* Restatement (Second) of Torts § 314A(1)-(2) (noting that common carriers owe a duty to take reasonable action to protect their passengers and innkeepers owe a similar duty to their guests). Ultimately, whether a special relationship and its concomitant duty exist is a question of policy.[4] *Erickson,* 447 N.W.2d at 169; *Pietila v. Congdon,* 362 N.W.2d 328, 333 (Minn. 1985). The result is that a duty to protect Haynes may be imposed on Newman/Gravzy if: (1) Haynes entrusted his safety to Newman/Gravzy; (2) Newman/Gravzy accepted that entrustment; and (3) Newman/Gravzy were in a position to, and should have been expected to, protect Haynes from criminal attack. *See Erickson,* 447 N.W.2d at 168.

■■ The court of appeals recognized that the landlord/tenant relationship historically had not been a special relationship giving rise to a duty to protect, but concluded that changes over time have brought it to a position somewhat analogous to the guest/innkeeper relationship, which gives rise to a duty to protect. *Funchess,* 615 N.W.2d at 400–01. The court concluded that through his lease

4. In deciding whether a special relationship exists, we look to the following policy considerations: crime prevention is essentially a government function, not a private duty; criminals are unpredictable and bent on defeating security measures; and because the issue arises where existing security precautions have failed, the question will always be whether *further* security measures were required and a property owner will have little idea what is expected of him or her. *Erickson,* 447 N.W.2d at 169. Further, we must consider the relative costs and benefits of imposing a duty—the level of risk balanced against the cost of providing the security that will reduce the risk to that level. *Id.*

Haynes had given Newman/Gravzy exclusive control over building security, security devices, and the areas outside the apartment. This cession of control created a special relationship between Newman/Gravzy and Haynes. Because of this special relationship, Newman/Gravzy owed Haynes a duty to use reasonable care to prevent foreseeable criminal acts against him by third parties. *Id.* at 401.

■ We are generally cautious and reluctant to impose a duty to protect between those conducting business with one another. *See Erickson,* 447 N.W.2d at 168. The court of appeals' analogy comparing the landlord/tenant relationship to that of the innkeeper/guest is insufficient to overcome this reluctance because it does not establish how the relationship between Haynes and Newman/Gravzy satisfies the third requirement listed above. No argument has been made that convinces us that Newman/Gravzy were in a position to, and should have been expected to, protect Haynes from criminal attack. We therefore conclude that there was no special relationship between Haynes and Newman/Gravzy, and thus no duty to protect under this theory.

■ The court of appeals also concluded that even if Newman/Gravzy initially did not owe a duty to protect Haynes, they assumed a duty to maintain the security measures they had already undertaken to protect him. *Funchess,* 615 N.W.2d at 401. The court held that by providing a secured rear entrance to the apartment building Newman/Gravzy assumed the duty to maintain the locking mechanism; thus, whether the duty of reasonable care was breached is a genuine issue of material fact. *Id.* Therefore, the court of appeals concluded, the district court's summary judgment was in error. *Id.*

One who voluntarily assumes a duty will be liable for damages resulting from fail-ure to use reasonable care. *Isler v. Burman,* 305 Minn. 288, 295, 232 N.W.2d 818, 822 (1975). The relevant Restatement section states:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
> (a) his failure to exercise such care increases the risk of such harm, or
>
> (b) the harm is suffered because of the other's reliance upon the undertaking.

Restatement (Second) of Torts § 323 (1965). We must decide whether, by providing security measures, Newman/Gravzy assumed a duty to maintain them that extends to protecting Haynes from harm inflicted by third-party criminals. In the terms used by the Restatement, we ask whether the security measures in place at the apartment building constituted a "service" to Haynes that Newman/Gravzy should have recognized was "necessary for the protection" of Haynes and his property.

This is an issue of first impression in our court. Courts in other states are divided on whether a landlord's provision of security measures can give rise to liability for harm to tenants that results from a failure to maintain those measures. *See, e.g., Walls v. Oxford Mgmt. Co.,* 137 N.H. 653, 633 A.2d 103, 106–07 (1993) ("[A] landlord who undertakes, either gratuitously or by contract, to provide security will thereafter have a duty to act with reasonable care."); *Sharp v. W.H. Moore, Inc.,* 118 Idaho 297, 796 P.2d 506, 509 (1990) ("A landlord, having voluntarily provided a security system,

is potentially subject to liability if the security system fails as a result of the landlord's negligence."); *Feld v. Merriam*, 506 Pa. 383, 485 A.2d 742, 747 (1984) ("[A] landlord may * * * incur a duty voluntarily or by specific agreement if to attract or keep tenants he provides a program of security."). *But see, e.g., Hall v. Rental Mgmt., Inc.*, 323 Ark. 143, 913 S.W.2d 293, 297 (1996) (holding that a landlord's implementation of "modest, conscientious measures" such as safety lighting, evening patrols, and communication with residents regarding suspicious activities, "do not rise to such a level that [the landlord] assumed a duty to protect its tenants from criminal attacks by third parties"). In several of the states where the duty to maintain security features gives rise to liability for harm to tenants, the duty imposed is limited to the extent of the security measures undertaken. *Walls*, 633 A.2d at 107; *see also Feld*, 485 A.2d at 747 ("A tenant may rely upon a program of protection only within the reasonable expectations of the program. He cannot expect that a landlord will defeat all the designs of felony. He can expect, however, that the program will be reasonably pursued and not fail due to its negligent exercise.").

We are not inclined to establish a rule that would discourage landlords from improving security. Transforming a landlord's gratuitous provision of security measures into a duty to maintain those measures and subjecting the landlord to liability for all harm occasioned by a failure to maintain that security would tend to discourage landlords from instituting security measures for fear of being held liable for the actions of a criminal. This limitation on the extent of the duty to maintain security measures leads us to conclude that any duty Newman/Gravzy might have had is not of the type to give rise to liability for Haynes' death.

Assuming the security door was malfunctioning, Newman/Gravzy still provided the security against criminal attack that Haynes could reasonably expect. The security guard was performing his duty, as evidenced by the fact that he chased the intruders off the apartment complex property. The security door to the building would appear to have existed to keep unwanted visitors out of the apartment building, not out of Haynes' apartment. Given that the lock on Haynes' door existed to keep intruders out of his apartment, we cannot say, with reference to the Restatement section quoted above, that Newman/Gravzy "should [have] recognize[d]" the security door as "necessary for the protection" of Haynes and his property. Restatement (Second) of Torts § 323.

Although there may be other circumstances in which the duty to maintain security measures would give rise to liability for injuries of the type presented here, those circumstances do not exist in this case. We conclude that in this case a duty to maintain the lock and buzzer/intercom system does not give rise to liability for the criminal acts of third parties entering Haynes' apartment.

■ The court of appeals also determined that a reasonable construction of the language of Haynes' lease with Newman/Gravzy required Newman/Gravzy to maintain the locks on building doors in a working condition and that breach of that contractual duty was a question of fact that precluded summary judgment on the issue. However, Funchess did not plead breach of contract in her complaint, nor did she argue breach of contract as a separate legal theory before the district court or the court of appeals. We will not consider such a claim now. *See Thayer v. Am. Fin. Advisers, Inc.*, 322 N.W.2d 599, 604 (Minn.1982).

Because we determine that Newman/Gravzy owed no legal duty to protect Haynes from his killers, we reverse the court of appeals. Consequently, we do not address the various arguments of the parties regarding breach, foreseeability of harm, or causation.[5]

Reversed.

5. Funchess has also filed a motion with this court requesting that we strike portions of Newman/Gravzy's brief and reply brief that rely on alleged inadmissible statements made in affidavits. The motion is denied.