*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A13-2078**

Catlin Underwriting Agencies, Ltd., et al.,
Appellants,

vs.

ALLETE, Inc.,
d/b/a Minnesota Power,
Respondent,

Schneider Electric USA, Inc., f/k/a Square D Company,
as successor in interest to Power Distribution Services, Inc.,
Defendant.

**Filed August 4, 2014
Affirmed
Rodenberg, Judge**

St. Louis County District Court
File No. 69HI-CV-11-122

David S. Evinger, Emily P. Hennen, Grotefeld Hoffmann Schleiter Gordon & Ochoa, LLP, Minneapolis, Minnesota (for appellants)

Thomas J. Basting, Jr., Elizabeth M. Brama, Diane B. Bratvold, Maren F. Grier, Briggs & Morgan, Minneapolis, Minnesota (for respondent)

        Considered and decided by Rodenberg, Presiding Judge; Johnson, Judge; and

Reilly, Judge.

UNPUBLISHED OPINION

**RODENBERG**, Judge

In this subrogation action, appellants Catlin Underwriting Agencies, Ltd. and other interested insurers (Insurers) challenge the district court's grant of summary judgment to respondent ALLETE, Inc., d/b/a Minnesota Power, arguing that Minnesota Power owes tort duties to United Taconite, LLC and that genuine issues of material fact exist as to whether Minnesota Power breached those duties. Because Minnesota Power owes no tort duties to United Taconite, we affirm.

## FACTS

The United Taconite Fairlane plant facility, located in Forbes, is a taconite mining and processing plant previously owned by Eveleth Mines, LLC. A system of protective relays and circuit breakers protect the plant's electrical equipment and its personnel. Minnesota Power is an electrical utility company that provides electrical power to the United Taconite plant. In 1997, Eveleth Mines and Minnesota Power entered into an agreement titled "Amended and Restated Electric Service Agreement" (ESA). When United Taconite purchased the plant, it acquired the rights and obligations of the ESA.

Under the ESA, United Taconite is required to maintain adequate protective equipment for the plant and is liable for the design of its equipment on its side of the point of delivery. The point of delivery is the end of Minnesota Power's service drop, which is located at two switches on the transmission lines inside the plant's substation fence. United Taconite owns all of the equipment inside the substation plant. After electricity is "delivered," the current runs through two United Taconite-owned oil circuit

breakers and a 115-kilovolt busbar to five United Taconite-owned transformers. The transformers reduce the voltage to 4160 volts and then distribute the electricity to the plant.

In addition to providing electricity to the plant, Minnesota Power provided protective-relay maintenance services in 1997, 2000, and 2004. The plant has a series of protective relays that sense fluctuations in the electrical current and signal other devices, including circuit breakers, to interrupt the current when necessary.

In May 1997, Minnesota Power sent a proposal to Eveleth Mines for "the cleaning, testing, and calibrating of each [Eveleth Mines] specified relay as well as the documenting of the 'as found' and 'as left' relay settings." Minnesota Power offered to provide one technician to perform the testing in the plant, with the technician relying on Eveleth Mines electricians "to keep a supply of relays ready for test[ing]." The proposal directed Eveleth Mines to issue a purchase order if it wanted Minnesota Power to perform the services. In October 1997, Eveleth Mines issued a purchase order to Minnesota Power that stated: "Minnesota Power to test and calibrate [Eveleth Mines'] protective relays as described in 5-15-97 proposal."

In December 1997, Minnesota Power sent a letter to Eveleth Mines describing the work it had performed. "The work included compiling relay information, visually checking the relays for loose parts or connections and indications of problems, cleaning relay contacts and taconite dust from the relays, testing the relays, recording the test results and correcting any problems that could be fixed at the time." The letter stated that "[a] significant number of relays were found to be providing little to no protection

3

because of bent, missing or extremely dirty contacts and other mechanical parts" and that "[s]etting sheets were not available on many of the relays, so it could not be determined if they were at a desirable setting." Minnesota Power then provided a list of recommendations to Eveleth Mines, including to "function test[] the control circuits and associated breakers to verify that the trip circuits are functional and [to perform] load checks, to make sure that the relays are in fact monitoring the actual load current."

In December 2000, Minnesota Power again provided maintenance on Eveleth Mines' protective relays. Also in 2000, Eveleth Mines hired Minnesota Power to conduct a "Power System Study" to analyze the plant's "existing electrical power system equipment and facilities for possible electrical problems." One of the two main parts of the study was "a relay coordination study for finding possible problems with protective devices during fault conditions" that included "all equipment on the 4160 volt system down through the main 480 volt static trip breakers." Individual motor overload protection was not addressed. The relay coordination study "indicated that all electrical equipment (that could be verified) has some fault protection, although some fault clearing times may be longer than desired."

In April 2004, Minnesota Power sent another proposal to United Taconite to test the protective relays. The "scope of services would include the cleaning, testing, and calibrating of approximately 177 United Taconite specified relays, as well as documentation of the 'as found' and 'as left' test results." Minnesota Power required that "an electrician from United Taconite be available to work with [its] technician to keep a supply of relays available for testing in a centralized location." In June 2004, United

4

Taconite sent a purchase order to Minnesota Power that stated: "During major shutdown Minn[esota] Power to calibrate 177 protective relays at plant per quote from . . . 4/27/2004."

Minnesota Power's employee, Clark Lamppa, performed the relay testing in August 2004. Lamppa has a two-year degree in industrial instrumentation from a vocational college in Eveleth and began working for Minnesota Power in 1989. As a relay technician, he tests, calibrates, and performs maintenance on Minnesota Power's and outside companies' protective relay systems. As had been the case on earlier such occasions, United Taconite and its electricians removed the relays from where they were in the plant and delivered them to Lamppa for testing at a table in the expansion substation of the plant. After Lamppa tested them, United Taconite electricians reinstalled the relays.

Just over two years later, in September 2006, senior relay technicians from Minnesota Power installed new panel protection relays on the two transmission lines. Minnesota Power replaced the old mechanical relays with microprocessor-based relays.

In October 2006, United Taconite employees were servicing a ball mill motor that had been sporadically shutting off.[1] Specifically, the employees were working on a Square D motor starter for the ball mill. On October 12, two United Taconite electronic technicians and one United Taconite electrical engineer were attempting to fix the ball mill in the motor control center room. At their request, the plant's control room initiated

---

[1] The ball mill, which is located inside the United Taconite plant, is a machine that crushes taconite into small pieces.

a start-up of the ball mill and, as the mill tried to start, the technicians heard a loud noise, saw a dense plume of black smoke, and saw a fire that looked like a blowtorch coming from the ball mill. The technicians escaped the motor control center, but the electrical engineer was unable to escape and died at the scene from smoke inhalation.

The United States Department of Labor Mine Safety and Health Administration (MSHA) investigated the accident. MSHA determined that

> [o]n October 12, 2006 at about 12:44 p.m., a short circuit occurred in the 4160 volt power lines located in the motor control center. These power lines distributed electrical power to ball mill Nos. 3, 4 and 5. The Allis Chalmers air-magnetic circuit breaker, located in the substation distribution room, which protected the power lines for ball mill Nos. 3, 4 and 5, failed to operate when a short circuit occurred. This short circuit resulted in sustained arcing that enveloped the motor control center room for more than three minutes, resulting in the death of a miner.

MSHA also determined that "[t]he oil circuit breakers located in the substation, which were used to protect transformer No. 5 and associated power lines from excessive overloads, failed to clear a fault that occurred in the substation distribution room." The failure of these oil circuit breakers "allowed a sustained fault in the substation distribution room that lasted for more than three minutes," and "[t]he electrical circuit feeding the substation distribution room, which distributed electrical power to the motor control center room, was not protected with overload protection." MSHA concluded that "[t]he accident occurred because the mine operator failed to ensure that the air-magnetic circuit breaker provided over-current protection for the electrical circuit. The severity of

this accident was impacted by the mine operator's failure to also provide circuit overload protection for the plant's incoming power feed circuit."

Insurers paid over $19 million to United Taconite to reimburse it for property damage that resulted from the October 2006 fire. Insurers, subrogated to the rights of United Taconite, sued Minnesota Power and Schneider Electric USA, Inc., alleging breach of contract, negligence, willful and wanton negligence, and breach of warranty against both companies. Insurers claim damages "in excess of $19,881,585."[2]

Insurers later withdrew their breach-of-warranty claims against Minnesota Power. Minnesota Power moved for summary judgment on the remaining claims. The district court granted the motion for summary judgment, holding that no evidence shows that Minnesota Power breached any contract and that "[t]he parties' contracts provide the only source of duties owing to [United Taconite] by Minnesota Power." The district court thus concluded that "[t]here is no evidence of any separate tort-related duties arising by operation of law." This appeal followed.

## D E C I S I O N

Insurers challenge the district court's dismissal of their negligence claims, asserting that Minnesota Power "negligently breached common-law duties" by failing to exercise reasonable care "while performing its contracts" at the United Taconite plant. Specifically, insurers contend that Minnesota Power was negligent in performing

---

[2] Schneider Electric manufactures, services, and sells electrical equipment in Minnesota. Insurers settled their claims with Schneider Electric during mediation, and those claims are not part of this appeal.

7

protective-relay maintenance in 2004 and in maintaining the protection level of the oil circuit breakers. Insurers do not argue that Minnesota Power was negligent in its provision of electricity under the ESA and do not challenge the district court's decisions on their contract claims. Minnesota Power responds that it had no duties to United Taconite independent from those created by contract.

In considering a district court's grant of summary judgment, we review de novo whether the district court properly applied the law and whether any genuine issues of material fact preclude summary judgment. *Riverview Muir Doran, LLC v. JADT Dev. Grp., LLC*, 790 N.W.2d 167, 170 (Minn. 2010). No genuine issue of material fact exists "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *DLH, Inc. v. Russ*, 566 N.W.2d 60, 69 (Minn. 1997) (quotation omitted). "[W]hen the nonmoving party bears the burden of proof on an element essential to the nonmoving party's case, the nonmoving party must make a showing sufficient to establish that essential element" to survive summary judgment. *Id.* at 71.

"Negligence is generally defined as the failure to exercise such care as persons of ordinary prudence usually exercise under such circumstances." *Domagala v. Rolland*, 805 N.W.2d 14, 22 (Minn. 2011) (quotation omitted). A defendant is entitled to summary dismissal of a negligence claim when "the record reflects a complete lack of proof on any of the four essential elements of the claim: (1) the existence of a duty of care, (2) a breach of that duty, (3) an injury, and (4) the breach of the duty being the proximate cause of the injury." *Gradjelick v. Hance*, 646 N.W.2d 225, 230 (Minn. 2002).

## I. Duty of Care

"The existence of a duty of care is a threshold question because a defendant cannot breach a nonexistent duty." *Doe 169 v. Brandon*, 845 N.W.2d 174, 177 (Minn. 2014). Whether a duty exists is a legal question, which we review de novo. *Glorvigen v. Cirrus Design Corp.*, 816 N.W.2d 572, 581 (Minn. 2012).

A party is not liable for damages in tort "if the duty breached was merely imposed by contract, and not imposed by law." *Id.* at 584 (quotations omitted). The difference between a tort action and a contract action is "whether a duty has been breached other than one established by contract." *D & A Dev. Co. v. Butler*, 357 N.W.2d 156, 158 (Minn. App. 1984). These actions protect different interests:

> Through a tort action, the duty of certain conduct is imposed by law and not necessarily by the will or intention of the parties. The duty may be owed to all those within the range of harm, or to a particular class of people. On the other hand, contract actions protect the interests in having promises performed. Contract obligations are imposed because of conduct of the parties manifesting consent, and are owed only to the specific parties named in the contract.

*80 S. Eighth St. Ltd. P'ship v. Carey-Canada, Inc.*, 486 N.W.2d 393, 395-96 (Minn. 1992).

As discussed below, we hold that Minnesota Power did not owe United Taconite a duty to warn or a duty to perform beyond the contractual duties upon which the contracting parties had agreed.

## A.      Relay Maintenance

Insurers contend that the work performed on the protective relays by Minnesota Power in 2004 gave rise to tort duties to United Taconite. They assert that Minnesota Power should have alerted United Taconite "to the danger that [the protective relays' tap setting of 0.2] could reduce the tripping reliability of the circuit"; that Minnesota Power should have changed the tap setting; and that Minnesota Power should have performed a system-function test during the protective-relay maintenance. It is undisputed that the contract between Minnesota Power and United Taconite for the 2004 service—consisting of the April 2004 proposal and the June 2004 purchase order—does not require any of these actions by Minnesota Power. And insurers agree that the actual testing of the relays was not negligently performed as called for by the parties' agreement. We conclude that Minnesota Power did not owe United Taconite any common-law duties to either warn or perform additional duties outside of the 2004 contract for maintenance on the protective relays.

"Generally, no duty is imposed on an individual to protect another from harm, even when she realizes or should realize that action on her part is necessary for another's aid or protection." *Bjerke v. Johnson*, 742 N.W.2d 660, 665 (Minn. 2007) (quotation omitted). A duty may arise if the defendant's own conduct creates a foreseeable risk of harm to a foreseeable plaintiff or if the parties are in a special relationship and the harm is foreseeable. *Domagala*, 805 N.W.2d at 23.

Insurers do not argue that any affirmative act of Minnesota Power during the 2004 maintenance caused injury. *See Brandon*, 845 N.W.2d at 178 ("When we refer to the

10

defendant's own conduct, we mean misfeasance, which is active misconduct working positive injury to others." (quotations omitted)). Rather, insurers contend that Minnesota Power had a duty to warn or protect United Taconite from harm created by someone other than Minnesota Power. *See Domagala*, 805 N.W.2d at 23-24. Clark Lamppa, the relay technician who performed the maintenance in 2004, tested the relays as he found them. It is undisputed that Lamppa did not establish the 0.2 setting, and the parties' 2004 agreement made no reference to determining whether the 0.2 setting was proper. It is undisputed that relay engineers determine the proper settings and create "setting sheets" that list the proper settings.[3] Lamppa is not a relay engineer, and Minnesota Power did not hire a relay engineer as part of the 2004 work. Fact issues exist as to which company was supposed to create the setting sheets originally, but it is undisputed that, at the time of the 2004 testing, the setting sheets were not available to Lamppa and that Lamppa informed United Taconite that the setting sheets were not available. Lamppa and Minnesota Power were to "calibrate 177 protective relays." Insurers make no claim that the calibration was either not done or was done incorrectly.

The essence of insurers' claims is that Minnesota Power is liable for its "nonfeasance." Nonfeasance, or nonaction, is "passive inaction or a failure to take steps to protect others from harm." *Domagala*, 805 N.W.2d at 22. Inaction amounts to

---

[3] Although insurers allege in their brief that the 2000 "Power System Study" "contains the information necessary to determine the proper settings for a protective relay as . . . located," the engineer who prepared the 2000 study was deposed, and he testified that the study "doesn't hold the official settings." He explained that "the company that owns the protective relays needs to maintain settings, and so they need to have the final settings." And insurers point to no evidence in the record contrary to this testimony.

negligence only when the defendant "has a duty to act for the protection of others." *Id.* at 23.[4]

We next consider whether United Taconite and Minnesota Power had a special relationship such that Minnesota Power owed United Taconite a duty to protect or warn. Special relationships may arise in circumstances such as (1) between "parents and children, masters and servants, possessors of land and licensees, and common carriers and their customers"; (2) "when an individual, whether voluntarily or as required by law, has custody of another person under circumstances in which that other person is deprived of normal opportunities of self-protection"; and (3) "when an individual assumes responsibility for a duty that is owed by another individual to a third party." *Bjerke*, 742 N.W.2d at 665 (quotations omitted). A district court considers certain factors when determining whether a special relationship exists, including "the vulnerability and dependency of the individual, the power exerted by the defendant, and the degree to which the defendant has deprived the plaintiff of her ordinary means of protection." *Becker v. Mayo Found.*, 737 N.W.2d 200, 213 (Minn. 2007). A "special relationship" is defined as a "nonfiduciary relationship having an element of trust, arising esp[ecially] when one person trusts another to exercise a reasonable degree of care and the other knows or ought to know about the reliance." *Black's Law Dictionary* 1402 (9th ed. 2009).

---

[4] For a discussion of the limitations on tort remedies in Minnesota in suits between contracting parties and the doctrinal basis for those limitations, see *Torts: An Alternative Approach to Glorvigen v. Cirrus Design Corp.*, 40 Wm. Mitchell L. Rev. 224, 229-33 (2013).

Insurers have not shown that United Taconite had a special relationship with Minnesota Power so as to give rise to a duty to perform above and beyond the 2004 contract. United Taconite hired Minnesota Power to provide specific services as set forth in the April 2004 proposal. As the district court correctly observed, the 2004 contract called for Minnesota Power to perform "technician-level work," not "engineering services." Our courts are "generally cautious and reluctant to impose a duty to protect between those conducting business with one another." *Funchess v. Cecil Newman Corp.*, 632 N.W.2d 666, 674 (Minn. 2001). Insurers also have not established that Minnesota Power knew or should have known that United Taconite trusted or relied upon Minnesota Power to warn of the possibility of the relay settings being too low, to change such a setting if discovered, or to perform a full system-function test, none of which was required under the contract. And on this record, there is no showing that United Taconite expected Minnesota Power to reengineer its plant or do anything beyond the scope of the parties' agreement (which called for Minnesota Power only to clean, test, and calibrate the relays).

Moreover, the 2006 accident was not foreseeable at the time of the 2004 maintenance. *See Bjerke*, 742 N.W.2d at 667 ("Even where a special relationship exists, a duty is only imposed if the resulting injury was foreseeable."). The accident occurred over two years after the maintenance work and involved equipment that United Taconite owned and maintained. Minnesota Power's relay engineer testified in deposition that recommended relay settings may change over time. Insurers' own expert opined that the 0.2 setting *decreased the reliability* of the relays—he did not opine that it created a

13

probable risk of specific danger. Additionally, Minnesota Power replaced relays associated with the transmission lines one month before the accident. Even if Minnesota Power knew of the potential risk of the 0.2 setting, and even if it had superior knowledge of the risk (which the record does not establish), "superior knowledge of a dangerous condition by itself, in the absence of a duty to provide protection, is insufficient to establish liability in negligence." *Harper v. Herman*, 499 N.W.2d 472, 475 (Minn. 1993).

Because no special relationship existed between United Taconite and Minnesota Power, Minnesota Power owed no common-law duties to United Taconite to warn of a possibly low setting, to change such a setting, or to perform a full system-function test.

## B.    Oil Circuit Breakers

Insurers also contend that, because Minnesota Power assumed "exclusive control" over the oil circuit breakers, it had duty to ensure that the oil circuit breakers would protect the United Taconite plant. In their reply brief, Insurers narrow the issue: "[T]he issue is not whether the [oil circuit breakers] themselves failed to operate, but whether Minnesota Power should have warned the plant that the relays controlling the [oil circuit breakers] did not really include a 50P [protective relay] that would have provided overcurrent protection . . . ."

"One who voluntarily assumes a duty will be liable for damages resulting from failure to use reasonable care." *Funchess*, 632 N.W.2d at 674. In other words, "one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all." *State by Humphrey v. Philip Morris Inc.*, 551 N.W.2d

490, 493 (Minn. 1996). "Thus, a person may, by conduct, assume a duty where one did not previously exist and be liable for the failure to exercise due care in the performance of that duty." *Id.* at 494.

Insurers provide no evidence that Minnesota Power exercised exclusive control of the oil circuit breakers or assumed duties in addition to its contractual duties. The record includes inspection and maintenance reports for oil circuit breakers from various dates in the 1980s, 1990s, and 2000s, and purchase orders from Eveleth Mines and United Taconite to Minnesota Power from 1997, 2002, and 2005. But these reports and purchase orders are limited to maintenance work, and Insurers do not contend that Minnesota Power was negligent in providing that maintenance.

Even if Minnesota Power knew that there was no specific overcurrent protection, Insurers have not shown that Minnesota Power had an affirmative duty to protect or warn United Taconite of the plant's own limitations. *See Harper*, 499 N.W.2d at 475. In fact, it is undisputed that in 1997, Minnesota Power *did* recommend to United Taconite that it perform a function test of the circuits and associated breakers to verify their functionality. Minnesota Power did not design or create the plant's electrical system, and, as discussed above, Insurers have not established a special relationship between United Taconite and Minnesota Power.

## II.    Willful and Wanton Negligence

Willful and wanton negligence is "a failure to exercise ordinary care after discovering another in a position of peril." *Bryant v. N. Pac. Ry. Co.*, 221 Minn. 577, 585, 23 N.W.2d 174, 179 (1946). "[I]f a person fails to exercise ordinary care after (1)

15

the peril was present, and (2) the peril was known to the person, his ordinary negligence rises to a higher level of negligence—willful and wanton negligence." *Gage v. HSM Elec. Prot. Servs., Inc.*, 655 F.3d 821, 826 (8th Cir. 2011) (applying Minnesota law).

Insurers have not established that Minnesota Power owed a tort duty to United Taconite. Such a duty is required not only for ordinary negligence, but also for willful and wanton negligence. Insurers' claim that Minnesota Power committed willful and wanton negligence also fails.

## III. Statute of Limitations and Expert Affidavit

Because we hold that the district court properly concluded that Insurers' negligence claims are without merit, we do not reach Minnesota Power's alternative arguments that the two-year limitation period under Minn. Stat. § 541.051 (2012) applies or that Insurers did not timely serve an affidavit of expert disclosure under Minn. Stat. § 544.42 (2012).

**Affirmed.**

16