826 A.2d 443

Suzette HEMMINGS

v.

PELHAM WOOD LIMITED LIABILITY LIMITED PARTNERSHIP, et al.

No. 56, Sept. Term, 2002.

Court of Appeals of Maryland.

June 16, 2003.

524

Laurence A. Marder (Salsbury, Clements, Bekman, Marder & Adkins, L.L.C., on brief), Baltimore, for petitioner.

Philip B. Barnes (Jennifer Ryan Lazenby, Whiteford, Taylor, Preston, L.L.P., on brief), Towson, for respondents.

Argued before BELL, C.J., ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

BATTAGLIA, J.

Suzette Hemmings petitioned this Court to review an order for summary judgment entered in favor of Pelham Wood Limited Liability Limited Partnership and RLA Management, L.L.P. (hereinafter the "Landlord"), the owner and manager, respectively, of Pelham Wood Apartments (hereinafter "Pelham Wood"). We granted Ms. Hemmings' petition to decide whether a landlord has a duty to repair a known dangerous or defective condition under its control to prevent a foreseeable third party criminal attack upon a tenant within a leased apartment unit, and whether there is sufficient evidence of such condition to make summary judgment inappropriate. For the reasons explained below, we conclude that the Circuit Court's entry of summary judgment was in error.

## I. Background

### A. Facts

On November 25, 1997, Ms. Hemmings, with her husband, Howard Hemmings, entered into an agreement with the Landlord to lease a two-bedroom apartment at Pelham Wood, a multi-building apartment complex consisting of four hundred units in Baltimore County. The Hemmings' lease provided in part:

LANDLORD AND TENANT AGREE:

17. That [the] Landlord has the right to enter the [apartment] at any time by master key or by force, if necessary, to inspect the Premises, to make repair/alterations in the [apartment] or elsewhere on [the] Landlord's property, to enforce any provision of this Lease or to show the [apartment] to prospective future tenants or purchasers without being liable to prosecution therefore, or damages by reason thereof.

\* \* \*

22. That ... [the] Landlord shall be responsible for repairs to the [apartment], its equipment and appliances furnished by [the] Landlord....

\* \* \*

LANDLORD AGREES:

35. That the [apartment] will be made available such that it will not contain conditions that constitute, or if not properly corrected would constitute, a fire hazard or a serious and substantial threat to the life, health or safety of occupants.

\* \* \*

TENANT AGREES:

45. That [the] Landlord shall not be liable for an injury, damage or loss to person or property caused by other tenants or other persons, or caused by theft, vandalism, fire, water, smoke, explosions or other causes unless the same is exclusively due to the omission, fault, negligence or other misconduct of [the] Landlord.

\* \* \*

RULES AND REGULATIONS
TENANT WILL NOT:

\* \* \*

7. Change the locks on the doors of the Premises or install additional locks, door knockers, chairs or other fasteners without the prior written permission of [the] Landlord

The Hemmings resided at 5 Lynfair Court, one of several apartment buildings at Pelham Wood. Their two-bedroom apartment unit, Apartment A–2, was located on the second floor of 5 Lynfair Court, just above the ground level apartment. A sliding glass door in the Hemmings' apartment allowed access to a rear patio balcony overlooking a wooded area.

In an attempt to deter criminal activity at Pelham Wood, the Landlord had implemented several security devices. Howard Gartner, the Landlord's corporate designee, stated that "[t]here is exterior lighting around the property [and that] each apartment has a regular door lock on its front door as well as a dead bolt door lock." For the apartments with patio doors, like the Hemmings', the Landlord provided "what is commonly referred to as a Charlie Bar," a horizontally mounted bar securing the sliding glass door. In addition, "[t]he [apartment] windows ha[d] locks on them," and there was "interior lighting in the [common area] hallways." For the "terrace" or ground level apartments only, the Landlord also provided alarm systems, which, once armed, generated a "strong and loud noise" when one opens an apartment door.

At approximately 1:17 a.m. on June 13, 1998, an unidentified intruder entered the Hemmings' apartment through the sliding glass door and, upon encountering Mr. Hemmings in the apartment bedroom, shot him twice in the abdomen. Mr. Hemmings died from gunshot wounds later that morning at the University of Maryland Shock Trauma Center.

After the attack, the Baltimore County Police Department initiated an investigation. The police incident report of the investigation [1] noted that the intruder, who was not known to Mr. Hemmings, entered the apartment by forcing open the sliding glass door from the patio.

---

1. The Baltimore County Police Department moved to quash Ms. Hemmings' subpoena for documents related to the investigation. This motion was granted. The incident report, therefore, provided the only available investigation information from the police.

Patrick M. Gunning, a contractor whom the Landlord had hired to repair the sliding glass door in the Hemmings' apartment on June 22, 1998, noted that the "whole left side of the [sliding glass door] frame [,the area of] the locking mechanism[,] . . . was totally mutilated" and that the aluminum frame around the door was "mangled,' twisted," and "destroyed." He also stated that the locking mechanism no longer functioned and that it appeared irreparable, as if "somebody had taken a jackhammer and actually beat it to death." According to Mr. Gunning, the marks on the door and locking mechanism, which he believed had been caused by an object, were on the exterior side of the door, and no marks appeared on the interior portion of the door. As for the middle portion of the sliding door, Mr. Gunning recalled that "it was flexed outward as far as it could go without actually breaking the glass."

Mr. Gunning also described the remains of a Charlie Bar on the sliding glass door he repaired. Mr. Gunning believed a Charlie Bar had been on the door "at one time" because "the cradle that [the Charlie Bar] lays in" remained attached to the door at the time of his repairs. As for the bar itself, though, he found "nothing of a [Charlie] bar whatsoever." Mr. Gunning replaced the old "housing mechanism," disposing of it and furnishing an entirely new Charlie Bar for the door.

Several tenants of the apartment building where the Hemmings lived, 5 Lynfair Court, recalled the state of the lighting around their building prior to the Hemmings incident. One indicated that there was "not a light fixture against the wall . . . outside of [her] apartment" in the rear of 5 Lynfair Court. Another who lived immediately below the Hemmings' apartment at the time of the incident, described the lighting at the rear of the building as follows: "Pitch dark. You can't see anything. Even if I would look outside, I couldn't identify anyone in that area because it is really dark." That tenant stated that the front of 5 Lynfair Court was well lit but that the back of the building was not equipped with a working light and was "too dark." Still another tenant of 5 Lynfair Court recalled that the back of the building had "always been dark"

until the Landlord added additional lighting "[w]ay after" the Hemmings incident.

The Pelham Wood property manager at the time of the shooting, Marsha Sultan, provided a description of the exterior lighting around 5 Lynfair Court. She stated that there is a light on the front "entrance door into the building," a roof light facing the "side of the building," and a roof light "in the back of the building." Ms. Sultan was not sure whether this exterior lighting was working "at the time Mr. Hemmings was shot."

Mr. Gartner, the Landlord's corporate designee, also declared that he could not tell "one way or the other" whether the exterior lights of 5 Lynfair Court were functioning on June 13, 1998. He was certain, however, that no lights were in place on the balcony of 5 Lynfair Court on that date.

The Police Department had filed crime reports for twenty nine burglaries or attempted burglaries and two armed robberies that had occurred at Pelham Wood over the two-year period preceding the incident involving Mr. Hemmings.[2] One of the alleged armed robberies took place inside an apartment unit; the other involved an assailant who, bearing a submachine gun, approached the victim from the woods near an apartment building. The crime reports further indicated that, in five of the burglaries, the intruder had entered the apartment through its sliding glass door.

A call report list, which the Police Department maintains to track telephone calls requesting police service, listed several violent crimes that had occurred at Pelham Wood. The listed crimes included kidnaping, rape, attempted rape, armed robbery, unarmed robbery, and numerous incidents of first or second-degree assaults, one of which had occurred at 5 Lynfair Court. The report list also included crimes against property such as theft and burglary, and breaking and enter-

---

2. The police department's list of reported calls indicates that an additional forty calls were made to report burglaries occurring at Pelham Wood.

ing. One report indicated that a theft had occurred at 5 Lynfair Court on November 8, 1996. Another report indicated that, on October 3, 1996, there had been a burglary of the same apartment that the Hemmings later had leased. The crime report form describing that burglary, the occurrence of which the downstairs tenants recalled, stated that the intruders entered the apartment through the "rear patio door" using an "un[known] tool to gain entry [through the] patio."

In addition, the Landlord maintained files with tenant complaints about criminal activity in and around the apartment complex. During the period between July 1, 1995, and June 30, 1998, Tenants had complained about various types of criminal activities: armed robbery, robbery, threats at gunpoint, theft within apartment units, vandalism, apartment break-ins, burglaries and attempted burglaries, theft from a balcony, theft in common areas, and drug use in common areas. Furthermore, of these tenant complaints, four mentioned burglaries, two complained of attempted burglaries, and one involved a robbery.

Other than the tenant complaints; the Landlord did not keep records of criminal activity at Pelham Wood. Nevertheless, Mr. Gartner stated that the Police Department, on two occasions, requested the Landlord's assistance in conducting surveillance for suspected criminal activity. Gartner also stated that, on "three or four [occasions] in 17 years," he had been present when police officers had stopped by the Pelham Wood rental office to report incidents of crime that had occurred on the premises. Additionally, about four or five times per year, tenants had complained to the rental office about break-ins at Pelham Wood, and the rental manager had informed Mr. Gartner of the complaints.

Ms. Sultan stated that she "ha[sn't] had that much knowledge of crime happening" at Pelham Wood and never has contacted the Police Department concerning its records of crime at Pelham Wood. Neither has she reviewed any police reports of criminal activity on the premises.

## B. Procedural History

On June 14, 1999, Ms. Hemmings filed wrongful death and survival claims against the Landlord in the Circuit Court for Baltimore County. Among Ms. Hemmings' allegations, she stated that the Landlord "failed to exercise reasonable care in taking sufficient precautions to prevent harm from occurring to [the Hemmings]" and "negligently allow[ed] dangerous conditions to remain unaddressed at the Hemmings' apartment."[3]

After the parties conducted discovery, the Landlord and Ms. Hemmings filed cross motions for summary judgment. The Landlord posited that it "owed no duty to Mr. and Mrs. Hemmings to protect them from the violent crime" because "[t]he murder took place in the victim's apartment rather than in the common area of the apartment building." The Landlord contended, additionally, that it had "fulfilled all of the security measures that they voluntarily undertook at the Hemmings' apartment and the apartment complex." In response, Ms. Hemmings argued that the Landlord, as a matter of law, owed a "legal duty to provide adequate security to prevent the criminal activity" by *inter alia* "provid[ing] adequate exterior lighting" and by "adequately secur[ing] the Hemmingses' apartment...."

The Circuit Court heard arguments on the motions on July 30, 2001 and, that same day, decided that summary judgment in favor of the Landlord should be granted. In the Circuit Court's view, the Landlord acted within the standard of care by providing working locks on the apartment doors. The Circuit Court Judge explained his reasoning orally:

> I mean, I can't get by the first tier. You say on one hand that the intruder had to break in. That obviously means the place was secure and there were locks that properly worked and the door was secured. And if there was nothing wrong with it and he didn't break in, that means the

---

3. Ms. Hemmings amended her complaint twice, once on July 22, 1999, and again on August 23, 1999. These final allegations appear in Ms. Hemmings' second amended complaint.

tenant in this particular case allowed the intruder in. Under either theory, I don't see where there is any duty of the landlord to go any further than that. I think the Court of Special Appeals will have to sort it out.

Ms. Hemmings appealed to Court of Special Appeals, which affirmed the summary judgment, holding that "[f]rom the facts presented, a fact finder would be constrained to conclude that there could be no showing that [the Landlord's] failure to maintain the common areas was the proximate cause of the fatal event." *Hemmings v. Pelham Wood,* 144 Md.App. 311, 323–24, 797 A.2d 851, 859 (2002). Although the intermediate appellate court recognized that the Landlord had a duty to provide reasonable security against criminal acts in the common areas of the apartment complex, it refused to apply this duty to require protection from criminal acts that occur within the leased premises. *Id.* at 319 & n. 6, 797 A.2d at 856 & n. 6.

We granted Ms. Hemmings' petition for a writ of certiorari, *Hemmings v. Pelham Wood,* 370 Md. 268, 805 A.2d 265 (2002). We combine and rephrase the questions in her petition as follows:

Does a landlord have a duty to repair a known dangerous or defective condition under its control to prevent a foreseeable third party attack upon a tenant within the leased premises, and was there sufficient evidence of such condition to make summary judgment inappropriate? [4]

We answer this question in the affirmative.

## II. Standard of Review

This Court exercises plenary review over a trial court's decision to grant summary judgment. *See Beyer v.*

---

4. Ms. Hemmings' petition for writ of certiorari presented the following three questions:

1. Does the mere fact that a tenant is murdered by an unknown intruder *within the demised premises* after breaking and entering preclude a landlord's liability under circumstances in which the landlord has retained control over and assumed a duty to provide adequate exterior lighting to deter crime, and the landlord's failure to

*Morgan State Univ.,* 369 Md. 335, 359, 800 A.2d 707, 721 (2002); *Schmerling v. Injured Workers' Ins. Fund,* 368 Md. 434, 443, 795 A.2d 715, 720 (2002). Nevertheless, "ordinarily we will not affirm the granting of a summary judgment for a reason not relied upon by the trial judge." *Cheney v. Bell National Life Ins.,* 315 Md. 761, 764, 556 A.2d 1135, 1137 (1989); *see Henley v. Prince George's County,* 305 Md. 320, 333, 503 A.2d 1333, 1339–40 (1986); *Geisz v. Greater Baltimore Medical Ctr.,* 313 Md. 301, 314 n. 5, 545 A.2d 658, 664 n. 5 (1988).

In reviewing an order for summary judgment, we determine whether the trial court conformed to the requirements under Maryland Rule 2–501(e), which provides that "[t]he court shall enter judgment in favor of or against the moving party if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law." Therefore, in reviewing the Circuit Court's grant of summary judgment, we must first determine whether material facts are in dispute. *Todd v. MTA,* 373 Md. 149, 154–55, 816 A.2d 930, 933 (2003). If no material facts are disputed, our inquiry becomes whether the Circuit Court "was legally correct," or, in other words, correctly determined that the Landlord was entitled to judgment as a matter of law. *Id.* at 155, 816 A.2d at 933. Furthermore, when reviewing a trial

provide such lighting in the common areas enhanced the risk of criminal activity?

2. Does the mere fact that a tenant is murdered *within the demised premises* after a breaking and entering though the sliding glass door of the apartment's rear balcony preclude a landlord's liability under circumstances in which the landlord voluntarily assumed a duty to provide a "charlie bar" to prevent forcible entry and there is evidence that the landlord failed to so provide?

3. Whether a landlord, aware of an extensive criminal history on the property, has a duty to provide tenants adequate security for the premises irrespective of whether the criminal activity at issue occurred inside the common areas under circumstances in which there are allegations that the landlord was negligent with respect to the management of common areas under its control and that the landlord's mismanagement caused injury within the leased premises?

court's order for summary judgment, we construe the facts properly before the court as well as reasonable inferences that may be drawn from them in the light most favorable to the non-moving party. *Id.* (citing *Okwa v. Harper,* 360 Md. 161, 178, 757 A.2d 118, 127 (2000)).

In *Brown v. Dermer,* 357 Md. 344, 355–56, 744 A.2d 47, 53–54 (2000), we recently discussed the role of summary judgment in determining matters that ordinarily are reserved for the fact-finder, such as knowledge, intent, or motive:

> As was explained in *Federal Sav. & Loan Ins. Corp. v. Williams,* 599 F.Supp. 1184 (D.Md.1984), summary judgment is generally not appropriate for issues concerning knowledge, motive, or intent because "the facts concerning the defendant's knowledge and conduct, and the circumstances in which they existed, as well as any determinations of how they relate to the legal standard . . . are best left for resolution by the trier of fact at trial." *Id.* at 1213. *See e.g. Stern v. United States Gypsum, Inc.* 547 F.2d 1329, 1345 (7th Cir.1977)("Summary judgment motions are particularly inappropriate vehicles by which to judge subjective considerations such as motive, intent, or knowledge."). *See also, Staren v. American National Bank and Trust Company of Chicago,* 529 F.2d 1257, 1261–62 (7th Cir.1976); *Conrad v. Delta Air Lines, Inc.,* 494 F.2d 914, 918 (7th Cir.1974); *Schoenbaum v. Firstbrook,* 405 F.2d 215, 218 (2d Cir.1968), *cert. denied, Manley v. Schoenbaum,* 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969).

## III. Discussion

■■ To succeed on a negligence claim, a plaintiff must prove four well-established elements: " '(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty.' " *Todd,* 373 Md. at 155, 816 A.2d at 933 (quoting *Muthukumarana v. Montgomery County,* 370 Md. 447, 486, 805 A.2d 372, 395 (2002) (quoting *Valentine v. On Target, Inc.,*

353 Md. 544, 549, 727 A.2d 947, 949 (1999) (quoting *BG & E v. Lane*, 338 Md. 34, 43, 656 A.2d 307, 311 (1995)))). Because whether one party owed a duty to another requires a legal determination based on statutes, rules, principles, and precedents, it is ordinarily for the court rather than the jury to decide. *Valentine*, 353 Md. at 549, 727 A.2d at 949 ("[T]he existence of a legal duty is a question of law to be decided by the court."); *see also* W. Page Keeton, et al., *Prosser & Keeton on Torts* § 37, at 236 (5th ed., 1984) ("[W]hether the interest of the plaintiff which has suffered invasion was entitled to legal protection at the hands of the defendant .... is entirely a question of law, to be determined by reference to the body of statutes, rules, principles and precedents which make up the law ...."). We have defined duty as " 'an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another.' " *Todd*, 373 Md. at 155, 816 A.2d at 933–34 (quoting *Muthukumarana*, 370 Md. at 486, 805 A.2d at 395 (quoting *Ashburn v. Anne Arundel County*, 306 Md. 617, 627, 510 A.2d 1078, 1083 (1986))).

The resolution of the present matter turns on our evaluation of the first two negligence elements: duty and breach. Ms. Hemmings argues that the Landlord's duty involves more than providing working locks on apartment doors, as the Circuit Court's ruling suggested. Instead, she maintains, the Landlord must maintain the areas under its control to prevent an attack upon a tenant within the apartment unit. She claims that, among other allegations, the Landlord controlled and failed to maintain the exterior lighting located within the common areas.

The Landlord counters that it owed no duty to protect Mr. Hemmings from the criminal act because "it had no control over any aspect of the break-in." For example, according to the Landlord, it "did not have day-to-day control over the apartment's locks," and "only the Hemmings could utilize the security devices provided to them to keep crime out of their home." The Landlord further contends that it did not breach any duty owed to Mr. Hemmings because it had "no notice of

any defect in, or inadequacy of, any security measures that were in place" at the time of the Hemmings incident.

## A.

█ When a landlord has leased property but has not parted control with a portion of it, we have held that the landlord may be liable for a foreseeable injury caused by a known dangerous or defective condition located within the part of the property over which the landlord retained control. As our discussion will highlight, the duty of a landlord in these cases depends on the existence of three circumstances: (1) the landlord controlled the dangerous or defective condition; (2) the landlord had knowledge or should have had knowledge of the injury causing condition; and (3) the harm suffered was a foreseeable result of that condition.

A landlord's control over conditions on its premises always has been a critical factor that we consider in determining landlord liability. Judge Eldridge, speaking recently for the majority of the Court in *Matthews v. Amberwood Assoc.*, 351 Md. 544, 557, 719 A.2d 119, 125 (1998), described our traditional emphasis in premises liability cases addressing the landlord's control over the dangerous or defective condition:

[A] common thread running through many of our cases involving circumstances in which landlords have been held liable (*i.e.*, common areas, pre-existing defective conditions in the leased premises, a contract under which the landlord and tenant agree that the landlord shall rectify a defective condition) is the landlord's ability to exercise a degree of control over the defective or dangerous condition and to take steps to prevent injuries arising therefrom.

█ Conversely, when a landlord *has* turned over control of a leased premises to a tenant, it ordinarily has no obligation to maintain the leased premises for the safety of the tenant. *See Matthews*, 351 Md. at 556–57, 719 A.2d at 125 ("The principal rationale for the general rule that the landlord is not ordinarily liable for injuries caused by defects or dangerous conditions in the leased premises is that the landlord 'has parted with

control.' ") (quoting *Marshall v. Price*, 162 Md. 687, 689, 161 A. 172, 172 (1932)); *Elmar Gardens, Inc. v. Odell*, 227 Md. 454, 457, 177 A.2d 263, 265 (1962) ("Mere ownership of land or buildings does not render the owner liable for injuries sustained by tenants or invitees rightfully on the premises, for the owner is not an insurer of such persons but owes them the duty only to exercise ordinary care to render the premises reasonably safe."); *Marshall*, 162 Md. at 689, 161 A. at 172 ("The law is well settled that, when the owner has parted with his control [of a leased premises], the tenant has the burden of the proper keeping of the premises, in the absence of an agreement to the contrary; and for any nuisance created by the tenant the landlord is not responsible.").

In *Matthews*, Judge Eldridge included "common areas" among the portions of a landlord's property over which it retains control. This reference to "common areas" relates to situations "where a landlord leases separate portions of a property to different tenants and reserves under his control halls, stairways, and other portions of the property used in common by all tenants." *Elmar Gardens, Inc.*, 227 Md. at 457, 177 A.2d at 265 (citing *Landay v. Cohn*, 220 Md. 24, 150 A.2d 739 (1959)). In such situations, we have required landlords to "exercise ordinary care and diligence to maintain the [common areas] in a reasonably safe condition." *Langley Park Apartments v. Lund*, 234 Md. 402, 407, 199 A.2d 620, 623 (1964). "This Court, thus, has sustained landlord liability for injuries that occur in common areas within the landlord's control where it can be shown that the landlord knew or had reason to know the danger existed." *Shields v. Wagman*, 350 Md. 666, 675, 714 A.2d 881, 885 (1998).

We have applied this duty of a landlord to cases in which a tenant's injury has occurred within the common areas. For example, we have held that the landlord is liable for dangerous or defective physical conditions within common areas when the landlord knew of the condition. *See Langley Park Apts.*, 234 Md. at 409–10, 199 A.2d at 624. In *Langley Park Apts.*, a tenant suffered injuries when she slipped and fell on an icy

walkway in the common areas of the landlord's apartment complex. *Id.* at 403–04, 199 A.2d at 621. We held that:

an accumulation of ice or snow upon the common approaches to tenement houses or multi-family apartment buildings may result in imposing on the landlord liability for injuries due to it, provided he knew, or in the exercise of reasonable care should have known, of the existence of a dangerous condition and failed to act within a reasonable time thereafter to protect against injury by reason of it.

*Id.* at 410, 199 A.2d at 624. Explaining the rationale for this holding and focusing on the landlord's control over the premises and its knowledge of the dangerous condition, we stressed that, between the landlord and the tenant, the landlord was in the better position to abate the danger posed by icy common walkways. *Id.* at 408, 199 A.2d at 623; *see also Macke Laundry Service Co. v. Weber,* 267 Md. 426, 433–36, 298 A.2d 27, 31–32 (1972) (holding a landlord liable for injuries sustained by the dangerous condition of a clothes dryer in the laundry room of an apartment complex); *Stein v. Overlook Joint Venture,* 246 Md. 75, 81–82, 227 A.2d 226, 230–31 (1967) (reversing directed verdict in favor of landlord where there was evidence that landlord had knowledge of the dangerous condition of the building's entranceway door but failed to take preventative steps to ensure the guest's safety).

By virtue of its control over the common areas, a landlord must exercise reasonable care to keep the tenant safe not only from known defective or dangerous physical conditions, such as icy common walkways, but also from certain criminal acts committed within the common areas. *Scott v, Watson,* 278 Md. 160, 169, 359 A.2d, 548, 554. In *Scott,* a tenant's surviving child claimed, in the United States District Court for the District of Maryland, that the landlord had breached a duty "to protect [the tenant] from criminal acts of third parties committed in common areas within their control." *Id.* at 161, 359 A.2d at 549–50. The District Court certified and we answered questions regarding various aspects of a landlord's duty where a tenant had been murdered by a third party in the common areas of an apartment building. In answering

one certified question, we found that the landlord to tenant relationship was not the sort of "special relationship" that gives rise to a "special duty" in tort, such as that of the common carrier to passenger relationship. *Id.* at 166–67, 359 A.2d at 552–53. We declined, therefore, to impose a "special duty ... upon the landlord to protect [its] tenants against crimes perpetrated by third parties on the landlord's premises." *Id.* at 166, 359 A.2d at 554. Nevertheless, we recognized that general principles of negligence require a landlord to "exercise reasonable care for the tenant's safety" in the common areas. *Id.* at 167, 359 A.2d at 553.

 Another certified question in *Scott* concerned the duty where the landlord has knowledge of criminal activity having taken place on the landlord's premises. *Id.* at 168, 359 A.2d at 552. The landlord's duty in that situation involves an affirmative obligation to provide reasonable security measures, as we explained:

> If the landlord knows, or should know, of criminal activity against persons or property in the common areas, he then has a duty to take *reasonable* measures, in view of the existing circumstances, to eliminate the conditions contributing to the criminal activity. We think this duty arises primarily from criminal activities existing on the landlord's premises, and not from knowledge of general criminal activities in the neighborhood.

*Id.* at 169, 359 A.2d at 554. For guidance in determining what criminal activity gives rise to this duty, we stated:

> Since the landlord can affect the risk [of injury to its tenants] only within [its] own premises, ordinarily only criminal acts occurring on the landlord's premises, and of which he knows or should have known (and not those occurring generally in the surrounding neighborhood) constitute relevant factors in determining, in the particular circumstances, the reasonable measures which a landlord is under a duty to take to keep the premises safe.

*Id.* Knowledge is essential to establishing a landlord's duty under *Scott.* Once a landlord has knowledge or should have

knowledge that criminal activity on the premises has created a dangerous condition, the landlord must take reasonable measures to eliminate or, in other words, correct the condition contributing to the criminal activity.

Besides control and knowledge of a dangerous or defective condition on the landlord's premises, our cases have found foreseeability of harm to be an important element in establishing a landlord's duty. We stated in *Matthews* that, in determining whether a duty exists "where the risk created is one of personal injury . . . the principal determination of duty becomes foreseeability." *Matthews,* 351 Md. at 561, 719 A.2d at 127 quoting *Jacques v. First National Bank of Maryland,* 307 Md. 527, 534–35, 515 A.2d 756, 759–60 (1986). In *Brown,* we recognized that "foreseeability" was a prerequisite test for determining a landlord's duty to correct a dangerous condition caused by lead paint in a leased premises. 357 Md. at 362, 744 A.2d at 57. To establish foreseeability, the plaintiff must present facts showing that a person of ordinary intelligence, who is equipped with the knowledge of the dangerous condition, should realize the danger posed by that condition. *Id.* The test for foreseeability "encompasses what a person of ordinary prudence should realize, not what he or she actually did know or realize." *Id.* Stated differently, a particular harm is foreseeable if a person of ordinary prudence should realize that the condition of which he or she has notice, enhances the likelihood that the harm will occur.

Applying this element of foreseeability requires examining the harm caused by the criminal act against the tenant. A landlord's duty under *Scott* obligates the landlord to take reasonable security measures to eliminate harm that is foreseeable, based on the nature of the known criminal activity on the premises. On the other hand, if the harm is not the sort of harm that a landlord of ordinary intelligence would associate with that criminal activity, the duty does not attach.

In its opinion in this case, the Court of Special Appeals refused to apply our holding in *Scott,* reasoning that *Scott* "is not controlling because the case *sub judice* involves an act that

occurred [not within a common area but] within the leased premises." *Hemmings*, 144 Md.App. at 317 n. 4, 797 A.2d at 855 n. 4. Ms. Hemmings urges this Court, however, that *Scott* should apply to the instant case because we have held that a landlord may be liable when a tenant suffers a foreseeable injury in the leased premises caused by a landlord's failure to use reasonable care for the tenant's safety in the common areas. We find Ms. Hemmings' argument persuasive.

As two of our cases illustrate, a landlord is not necessarily immune from liability because a tenant's injury occurs within a leased premises, rather than within common areas, if an uncorrected defect in the common area adversely affects occupants of the leased premises. In *2310 Madison Ave., Inc., v. Allied Bedding Mfg.*, 209 Md. 399, 408–10, 121 A.2d 203, 209–10 (1956), we held a landlord responsible for damage to a tenant's property in a leased premises because the damage resulted from the known defective condition of a water drainage system common to all tenants and under the landlord's control. We underscored the landlord's control and knowledge of the defective condition. As to the landlord's control, we stated: "[The] draining apparatus or appliance was not part of the demised premises in the occupation of the plaintiff. It was something used for the benefit of the whole building." *Id.* at 411, 121 A.2d at 210. We also were convinced that "notice [of the defect] was given in ample time to have the defect repaired before the last overflow, which caused the injury to the [tenant's] goods...." *Id.* at 412, 121 A.2d at 210. Although the tenant's injury occurred in the leased premises, we applied the "rule of liability ... in which a landlord is responsible for injuries sustained by tenants through negligence in or upon those parts or appurtenances of demised premises which remain under the charge and control of the landlord." *Id.* at 411–12, 121 A.2d at 210.

*Kinnier v. J. R. M. Adams, Inc.*, 142 Md. 305, 120 A. 838 (1923), which we relied upon in *2310 Madison Ave.*, is similarly applicable. In *Kinnier*, a tenant's property kept in the rented basement and ground floor of the landlord's building was damaged from water that leaked from the floor above. *Id.* at

306, 120 A. at 839. The damaging water sprang from a burst pipe over which the landlord exercised control. *Id.* at 308–09, 120 A. at 840. Notwithstanding that the harm occurred within the leased premises, we allowed the jury to determine whether the water damage resulted from the landlord's failure to prevent " 'injuries to a tenant . . . caused by the [landlord's] neglect to remedy defects in, or by [its] improper management of, appliances of which he retains control.' " *Id.* at 307, 120 A. at 839 (quoting 1 Tiffany, *Landlord and Tenant* § 91 at 641–46 (1910)).

■■■ Our holdings in *2310 Madison Ave.* and *Kinnier* support the proposition that a landlord's duty to maintain safe common areas is not limited to preventing harm that occurs only within the common areas. Rather, negligent maintenance of or failure to correct a known defect in areas under the control of the landlord may result in liability for injuries that occur within the leased premises. It follows, therefore, that the duty to use reasonable care for the tenant's safety within the common areas also may apply to injuries suffered from criminal acts within the leased premises. In other words, the fact that a criminal attack occurred within a leased apartment unit does not preclude the application of the duties set forth in *Scott.*

The Landlord argues, nevertheless, that the decision of the Court of Special Appeals comports with the law of other jurisdictions. In support of this contention, it cites only one case, *Cramer v. Balcor Property Management, Inc.,* 312 S.C. 440, 441 S.E.2d 317 (1994). In *Cramer,* the court held that a landlord of an apartment complex had no duty to protect its tenant from a murder within the leasehold that occurred following an apartment break-in. *Id.* at 318–19. Although the facts in *Cramer* virtually mirror those in the case *sub judice,* we cannot reconcile the South Carolina court's holding with the law in Maryland. "Under South Carolina law a landlord does not owe a duty to a tenant to provide security in and around a leased premises to protect the tenant from criminal activity of third parties." *Id.* at 319. South Carolina, conse-

quently, would not permit a tenant to recover from a landlord for *any* injury resulting from the criminal act of a third party, even if that attack occurred within common areas and could have been prevented by reasonable security measures. In Maryland, this is simply not the case. *Scott* explicitly imposes an affirmative duty upon landlords, in particular circumstances, to take reasonable security measures to prevent certain criminal activity. 278 Md. at 167–69, 359 A.2d at 553–54. Unlike under South Carolina law, the failure to provide reasonable security in Maryland may result in landlord liability for injuries caused by a third party's criminal acts. The Landlord's reliance on *Cramer* is, therefore, misplaced.[5]

---

**5.** To support its conclusion that the Landlord could not be held responsible for a criminal attack to a tenant within the leased premises, the opinion of the Court of Special Appeals discussed several additional cases from other states. *Hemmings,* 144 Md.App. at 319–23, 797 A.2d at 856–58. These cases are, however, distinguishable.

The court first discussed *Fields v. Moore,* 953 S.W.2d 523 (Tex.App. 1997). In that case the court refused to hold the landlord liable for the injuries of a tenant who was sexually assaulted in her rented house by another tenant who lived nearby on property also owned by the landlord. The court concentrated on the foreseeability of the crime. It found that the landlord could not have foreseen the assailant's crime because it did not have knowledge that the assailant previously had committed a violent crime. The court in *Fields,* however, never acknowledged any distinction between landlord liability for crimes committed within a leased premises and crimes committed in common areas.

The Court of Special Appeals also relied on two Michigan cases, *Samson v. Saginaw Prof'l Bldg., Inc.,* 393 Mich. 393, 224 N.W.2d 843 (1975), and *Williams v. City of Detroit,* 127 Mich.App. 464, 339 N.W.2d 215 (1983). In *Samson,* the court resolved a controversy involving a criminal attack in the common areas of a landlord's multi-unit facility. *Id.* at 849. As the court stated, though, it did not have to answer whether "the landlord retains any responsibility for actions which occur within the confines of the [ ] leased premises." *Id.* Only in dicta did the court suggest that a landlord "would not retain any responsibility for such actions [in the leased premises] except in the most unusual circumstances."

In *Williams,* the Court of Appeals of Michigan did address a tenant injury that resulted from a third party attack within a leased premises. The court cited *Samson* and did not impose liability on the landlord. The distinction between *Williams* and the case before us is that, in *Williams,* the tenant, by contract, expressly assumed the responsibility to provide security within the leased premises *Id.* at 218; under the Hemmings' lease, however, the tenant had no express responsibility to

Various of our sister states share our view that a landlord's negligent maintenance of a common area may lead to liability for criminal acts within a leasehold. In *Duncavage v. Allen*, 147 Ill.App.3d 88, 100 Ill.Dec. 455, 497 N.E.2d 433, 437–38 (1986), the court held that the representative of a deceased tenant stated a cause of action by alleging that the landlord's negligent maintenance of common areas proximately caused the rape and murder of the tenant within the apartment unit. The Court of Appeals of Georgia came to a similar conclusion in *Jackson v. Post Properties, Inc.*, 236 Ga.App. 701, 513 S.E.2d 259, 263 (1999). There, the court held that the tenant had presented sufficient evidence to allow the jury to determine whether the landlord, by inadequately maintaining the common areas, had breached its "duty to exercise ordinary care to prevent [a] foreseeable third-party criminal attack[ ] upon [a] tenant[ ]" within a leased apartment unit. *Id.* at 261, 263; *see also Guadagno v. Terrace Tenants Corp.*, 262 A.D.2d 355, 691 N.Y.S.2d 146, 148 (N.Y.App.Div.1999) (holding that

provide its owns security. *See supra* pages 2–3 (reciting relevant provisions of the Hemmings' lease).

Finally, Maryland's intermediate appellate court looked to a Missouri case that was decided on the pleadings. *Advance Rental Centers, Inc. v. Brown*, 729 S.W.2d 644 (Mo.Ct.App.1987). In *Advance Rental Centers*, the court held that the plaintiff tenant failed to allege the necessary elements of a cause of action against the landlord for a theft from the rented premises:

The petition does not allege any "special circumstances" suggesting the defendants were in a superior position to be aware of criminal acts and guard against them. The petition does not suggest the existence of prior similar crimes which might have put the [landlords] on guard. Neither is there any allegation indicating that defendants had retained any control of that portion of the premises from which the theft had occurred. . . . We hold that in the absence of such allegations of special circumstances, no cause of action is stated against a landlord for a breach of duty to protect his tenant from criminal acts of third parties.

*Id.* at 646. The "special circumstances" required in *Advance Rental Centers* do not focus on the place where the tenant injury occurred. Rather, like under Maryland law, the central inquiry involves whether the landlord controlled the condition that contributed to the criminal activity. Also like the cases in Maryland, *Advance Rental Centers* does not limit possible landlord liability to crimes that occur outside the leased premises.

the landlord's duty "to take minimal precautions to protect tenants from ... foreseeable criminal conduct" applied when common areas were inadequately secured and the tenant's apartment was burglarized); *Czerwinski v. Sunrise Point Condominium,* 540 So.2d 199, 200-01 (Fla.Dist.Ct.App.1989)(recognizing that the landlord owed a duty to provide security against foreseeable criminal attack upon a tenant in her leased apartment unit).

 Having determined that *Scott* may apply to harm occurring within the leased premises as well as within the common areas, it is useful, at this point, to summarize what is required to establish a landlord's duty to provide reasonable security measures. A landlord has a legal duty to take reasonable security measures within the common areas when: (1) the landlord had knowledge or should have had knowledge of criminal activity having taken place on the premises, and (2) a landlord of ordinary intelligence, based on the nature of the past criminal activity, should have foreseen the harm suffered.

## B.

 Once a landlord takes reasonable security measures to eliminate conditions that contribute to criminal activity on the premises, all of its duties with respect to those measures have not been fulfilled necessarily. Rather, a landlord has a continuing obligation to properly carry out the security measures it provides. *See Scott,* 278 Md. at 171, 359 A.2d at 555. In *Scott,* we recited the "elementary principle of tort law" that "even if no duty existed to employ the particular level of security measures provided by [a landlord], improper performance of such a voluntary act could in particular circumstances constitute a breach of duty." *Id.; see Miller v. Howard,* 206 Md. 148, 155, 110 A.2d 683, 686 (1955) ("Where the landlord undertakes to repair or improve the rented premises, whether or not he is bound by covenant to repair, he must exercise reasonable care in making such repairs or improvements, and he will be liable for any injuries sustained by the tenants as a result of his negligence, just as he would

be if he were obligated by a covenant in the lease to do the work.").

We believe that, to properly perform the security measures provided, the landlord has a duty to maintain and regularly inspect the devices implemented to deter criminal activity. That is, if the security devices that the landlord provides require regular maintenance or inspection for them to properly function, the landlord must do what is reasonable to maintain or inspect the devices. This obligation is analogous to a landlord's duty to "exercise ordinary care and diligence to maintain [areas under its control] in a reasonably safe condition." *Langley*, 234 Md. at 407, 199 A.2d at 623. *See* W. Page Keeton, et al., *Prosser & Keeton on Torts* § 63, at 440 (5th ed., 1984) ("[A landlord] is ... under an affirmative obligation to inspect and repair [common areas] for the protection of the lessee.").

Other states also require landlords to maintain their security measures. *Walls v. Oxford Management Co.*, 137 N.H. 653, 633 A.2d 103, 107 (1993) (recognizing that a landlord that provides lighting as a security measure "for the exterior of an apartment building might be held liable for failing to insure that the lighting functioned properly"); *see, e.g., Sharp v. W.H. Moore, Inc.*, 118 Idaho 297, 796 P.2d 506, 509 (1990) ("A landlord, having voluntarily provided a security system, is potentially subject to liability if the security system fails as a result of the landlord's negligence."); *Lay v. Dworman*, 732 P.2d 455, 459 (Okla.1986) ("[B]y retaining control over aspects of the premises such as door and window locks or alarm devices which directly relate to security, the landlord faces potential liability when the circumstances are such that a reasonable man would realize that a failure to act would render one relying on those actions susceptible to criminal acts."); *Feld v. Merriam*, 506 Pa. 383, 485 A.2d 742, 747 (1984) (stating that a tenant may expect that voluntarily provided "program [of security] will be reasonably pursued and not fail due to its negligent exercise").

The facts of the present case show that the Landlord provided exterior lighting at Pelham Wood as a security measure intended to deter criminal activity. Thus, it had a duty to adequately maintain that lighting.

## IV. Conclusion

In the case before us, the Circuit Court ruled that the Landlord fulfilled any duty to the Hemmings solely by providing a working lock on the patio door. The ruling, which was issued orally, stated:

> I mean, I can't get by the first tier. You say on one hand that the intruder had to break in. That obviously means the place was secure and there were locks that properly worked and the door was secured. And if there was nothing wrong with it and he didn't break in, that means the tenant in this particular case allowed the intruder in. Under either theory, I don't see where there is any duty of the landlord to go any further than that. I think the Court of Special Appeals will have to sort it out.

This analysis inaccurately described the Landlord's duty and insufficiently contemplated the relevant considerations for determining whether the Landlord owed a duty and, thereafter, breached that duty. We believe the appropriate analysis demands a closer examination of the facts in the record to determine whether the Landlord breached its duty in this case.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AND TO REMAND THE CASE TO THE CIRCUIT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION; COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENTS.*

RAKER, J., dissenting, joined by CATHELL, J., and HARRELL, J.

I would affirm the judgment of the Circuit Court for Baltimore County and the judgment of the Court of Special Appeals. *See Hemmings v. Pelham Wood,* 144 Md.App. 311, 797 A.2d 851 (2002). The Court of Special Appeals held that the landlord did not owe a duty to protect the tenant from criminal activity committed by third persons within the premises demised to the tenant, an area in which the landlord was no longer able to exert control. I agree.

Plaintiff, Suzette Hemmings, brought a wrongful death and survival action alleging lack of adequate security and lighting in and around the leased premises as the proximate cause of her husband's death. In plaintiff's second amended complaint, plaintiff alleged as follows:

¶ 6. Prior to June 13, 1998, complaints had been made notifying the Defendants of criminal activity in and around the Pelham Wood Apartments and of the vulnerability of specific buildings which back up to a wooded area which is completely dark.

¶ 7. Defendants were aware of the specific vulnerability of 5 Lynfair Court based on prior criminal incursions into that building, several of which required the response of the Baltimore County Police Department.

¶ 8. Defendants were aware and/or had reason to be aware of the criminal activity in and around Pelham Wood Apartments and/or had reason to be aware of the dangerous conditions that existed.

¶ 9. Despite the Defendants' knowledge of the criminal activity and the dangerous conditions that existed in and around Pelham Wood Apartments and, the Defendants' ability to take steps to ensure the safety of the premises and its tenants, the Defendants did nothing to eliminate the danger or enhance the safety of its tenants.

On the wrongful death and survival claim filed by Ms. Hemmings against her landlord, summary judgment in favor of the landlord was entered properly by the Circuit Court because

the plaintiff failed to establish sufficient evidence to state a cause of action in negligence. There is no duty on the part of the landlord to provide security within the premises demised to the tenant to protect the tenant from criminal violence perpetrated by third persons.[1] Neither is there a duty on the part of the landlord to ensure the safety of the premises or its tenants.

The majority concludes that "the facts of the present case show that the Landlord provided exterior lighting at Pelham Wood as a security measure intended to deter criminal activity. Thus, it had a duty to adequately maintain that lighting." Maj. op. at 28. Although the majority refers to evidence from tenants that there was no light fixture outside the wall of a particular apartment or that it was very dark outside, there is absolutely no evidence in this record that the Landlord received a complaint or notice that the light was not functioning. It is important to note at the outset that the adequacy of door locks, alarms or "charley bars" is not at issue in this case. The majority quotes in great detail provisions from the lease related to locks on the doors within the leasehold and the charley bar on the sliding glass door. The record reflects *no* complaints from the plaintiff-tenant or her decedent spouse to the landlord-defendant that the locks were inoperable or deficient or that the charley bar needed repair or replacement. *See* maj. op. at 2–6. Apparently recognizing that there was absolutely no notice of any problem with these security devices, the majority abandons, and rightfully so, these devices as a basis for any duty on the landlord's part to protect the tenant from harm occurring within the apartment.[2]

---

**1.** The majority recognizes and iterates the proper test for summary judgment and that the existence of duty in a negligence case is a question of law for the court. Maj. op. at 12. *See also Grimes v. Kennedy Krieger*, 366 Md. 29, 114–15, 782 A.2d 807, 858–59 (2001) (Raker, J., concurring).

**2.** The analysis and the result in this case might well be different if the basis for the landlord's liability was the landlord retaining control over aspects of the demised premises and particularly the locks and any alarm devices. It is important to note that ¶ 7 of the rules and

The entire basis of the majority opinion rests upon inade- quate lighting in the rear of the apartment building. The majority holds that because the landlord provided exterior lighting at Pelham Wood as a security measure intended to deter criminal activity, it had a duty to adequately maintain that lighting. *See* maj. op. at 28. From this duty to maintain adequate lighting in the common area, the majority makes the unjustified leap in logic that somehow the landlord is then responsible for violent criminal activity that occurred within the demised premises and not within the common area.[3]

It has long been the law in this State that there is no general duty to protect another person from crime. That rule applies to the ordinary relationship between landlord and

---

regulations of the lease restricting tenant from changing or installing additional locks on the doors without the landlord's written permission is *not* at issue in this case. Where the landlord insists on control over the decisions as to changing or maintaining locks or security devices, and permission has been withheld or the tenant has given notice and the landlord has not responded, the result may be different if injury occurs.

Many courts have recognized that "by retaining control over aspects of the premises such as door and window locks or alarm devices which directly relate to security, the landlord faces potential liability when the circumstances are such that a reasonable man would realize that a failure to act would render one relying on those actions susceptible to criminal acts." *Lay v. Dworman*, 732 P.2d 455, 459 (Okla.1986). The Oklahoma court found that a complaint stated a cause of action for injury to a tenant which occurred within the leased apartment where the landlord retained exclusive control over the door locks and the tenant had reported the broken lock. *Id.* at 458–59. The court found that:

"These principles appear to form the foundation for the landlord's liability in other jurisdictions in cases involving criminal acts within the rented premises. The element of foreseeability in these cases has been found from a history of criminal activity in the apartment complex or building, or strictly from the nature of the defect in the premises."

*Id.* at 459.

3. Under the plaintiff's theory and the majority's reasoning, it is solely the lack of "adequate" lighting which forms the basis for liability. Following the majority's reasoning, the lack of adequate lighting could form the basis of liability in the first place, as well as failure to adequately *maintain* existing lighting.

tenant, although a duty may exist under special circumstances. *See Scott v. Watson,* 278 Md. 160, 166, 359 A.2d 548, 552 (1976) (holding that there is no special duty imposed upon the landlord to protect his tenants against crimes perpetrated by third parties on the landlord's premises). In the absence of statute or special relationship, there is no duty to protect another from harm. *Id.,* 359 A.2d at 552. The general rule is that the landlord's duty to protect tenants or other persons on the leased property from the criminal acts of third parties does not arise unless there is a reasonably foreseeable risk of harm. *See* Annot., *Landlord Liability Criminal Acts,* 43 A.L.R. 5th 207, 406–08, 436–39 (1996). The commentators in that annotation note as follows:

> "The question whether a landlord is obligated to protect tenants against criminal activities of third parties is a specific facet of the more general issue as to whether a private person is under a duty to protect another against criminal conduct. As a general principle, and in the absence of statutes or of special relationships or circumstances ... a private person has no duty to protect another from a criminal assault or a willful act of violence of a third person, but that the duty to protect another from criminal attack may voluntarily be assumed by contract, and if it is, the law will recognize and enforce such a duty. . . .
>
> Traditionally, courts have found that the mere relation of landlord and tenant falls within the general rule and does not impose upon the landlord a duty to protect the tenant against criminal activities of third parties, ordinarily reasoning that the liability of a landlord for injuries or damages resulting from such activities must be predicated either upon the breach of a contractual or statutory obligation, or upon the foreseeability, under the circumstances, of the criminal occurrence."

*Id.* at 241.

A landlord is not the *insurer* of the safety of persons within the demised premises, or for that matter, in the common areas of the property. The duty of the landlord is a duty of reasonable care to protect against known or reasonably fore-

seeable risks. A landlord is not required to take precautions against criminal conduct committed by third persons which the landlord has no reason to anticipate. Nor is the landlord responsible for attacks that are not caused by the landlord's action or inaction. In the instant case, it is clear that the landlord did not owe plaintiff a duty to provide her with lighting that would inhibit or discourage break-ins by third parties into her apartment.

The plaintiff and majority's theory that there is potential liability arising from a breach of duty by the landlord because the landlord either undertook to light the back area and failed to maintain the lighting properly, or never undertook to light the back area and it should have done so, is not persuasive. Nor is the majority's theory that the single light in the rear of the apartment building was placed there by the landlord for security purposes. The plaintiff has not shown that the landlord did anything that could reasonably be considered as having voluntarily undertaken to provide protection from criminal activity by third parties within the leased premises. The one light in the rear of the building cannot be construed as a voluntary undertaking to provide security within the apartments; a failure to provide lighting in the rear of the complex cannot, and has not, been considered in this State as a basis to impose liability for injuries occurring within the demised premises. Even if the landlord did provide illumination in the common area, "the furnishing of outside lighting is commonplace and furnished by virtually every landlord to every tenant in a facility such as is involved here. It cannot reasonably be regarded as the assumption of a duty to protect against criminal acts." *Rowe v. State Bank of Lombard*, 125 Ill.2d 203, 126 Ill.Dec. 519, 531 N.E.2d 1358, 1365 (1988).

The majority relies primarily on the cases of *Matthews v. Amberwood*, 351 Md. 544, 719 A.2d 119 (1998) and *Scott*, 278 Md. 160, 359 A.2d 548.[4] Neither case supports the holding

---

**4.** I joined the majority in *Matthews,* and still believe that case was decided properly. If this case is the logical extension of *Matthews,* then I would join Judges Cathell and Harrell to overrule *Matthews.* (Judge

that the landlord has a duty to protect the tenant from criminal activity within the demised premises.

The majority relies on *Scott*, 278 Md. at 165, 359 A.2d at 552, as support for its conclusion that a duty exists. *Scott* is inapposite. The intermediate appellate court, in the present case, pointed out that *Scott* was inapposite to the plaintiff's claim:

"We cite *Scott v. Watson* as it establishes the basic principles of Maryland law with regard to the duty owed by a landlord in protecting the safety of his or her tenant. In *Scott*, however, the Court of Appeals was presented with the issue of whether the landlord of an urban apartment complex had a duty to protect tenants from the criminal acts of third parties committed in *common areas within the landlord's control.* The Court ultimately concluded that a duty would be imposed on the landlord only if the landlord had knowledge of increased criminal activity and if the premises were thereby rendered unsafe. *Scott*, however, is not controlling because the case *sub judice* involves an act that occurred within the leased premises. We deem this to be an overriding distinction."

*Hemmings*, 144 Md.App. at 317 n. 4, 797 A.2d at 855 n. 4.

*Scott* involved the murder of a tenant in the *common area,* an underground parking garage. Under the Maryland Uniform Certification of Questions of Law Act, Maryland Code (1974, 2002 Repl.Vol.), § 12–601 through § 12–613 of the Courts and Judicial Proceedings Article, and Maryland Rule 8–305, this Court considered "[w]hether a duty is imposed upon the landlord to protect his tenants from criminal acts of third parties where he has knowledge of increasing criminal

Harrell was not a member of this Court when *Matthews* was decided.) In my view, the outcome in *Matthews* was controlled by the fact that the tenant harbored a dangerous animal, known to the landlord, in violation of the lease agreement between the landlord and the tenant and thus within the landlord's ability to control the activity within the demised premises.

activity on the premises, or in the immediate neighborhood."
*Scott,* 278 Md. at 168, 359 A.2d at 553. We said:

> "The duty of the landlord to exercise reasonable care for the
> safety of his tenants *in common areas* under his control is
> sufficiently flexible to be applied to cases involving criminal
> activity without making the landlord an insurer of his
> tenant's safety. If the landlord knows, or should know, of
> criminal activity against persons or property in the common
> areas, he then has a duty to take *reasonable* measures, in
> view of the existing circumstances, to eliminate the condi-
> tions contributing to the criminal activity. We think this
> duty arises primarily from criminal activities existing on the
> landlord's premises, and not from knowledge of general
> criminal activities in the neighborhood. Every person in
> society is subject to the risk of personal injury or property
> damage from criminal activity, both inside and outside his
> abode. The risk obviously varies with the time and locale.
> Since the landlord can affect the risk only within his own
> premises, ordinarily only criminal acts occurring on the
> landlord's premises, and of which he knows or *should have
> known* (and not those occurring generally in the surround-
> ing neighborhood) constitute relevant factors in determin-
> ing, in the particular circumstances, the reasonable mea-
> sures which a landlord is under a duty to take to keep the
> premises safe."

*Id.* at 169, 359 A.2d at 554 (first and third emphases added).
*Scott* does not stand for the proposition that the landlord is
responsible for personal injury to a tenant as the result of
criminal activity that occurs within the premises under control
of the tenant and outside of the common areas.[5]

*Matthews* provides no support for the plaintiff. In *Mat-
thews,* a sixteen-month-old child, the son of a social guest of

---

**5.** The majority restates and embraces Ms. Hemmings' argument "that
*Scott* should apply to the instant case because we have held that a
landlord may be liable when a tenant suffers a foreseeable injury in the
leased premises caused by a landlord's failure to use reasonable care
for the tenant's safety in the common areas." Maj. op. at 21. Ms.
Hemmings' premise is wrong. *Scott* dealt with injury in the common
area and Ms. Hemmings misstates the holding.

the particular tenant, was killed by the host's pit bull. The tenant's lease provided that pets were prohibited on the premises. We held that the pit bull in question was an extremely dangerous condition within the tenant's apartment and that the landlord retained control over the presence of the dog in the leased premises by virtue of the "no pet" clause in the lease. *Matthews*, 351 Md. at 558, 719 A.2d at 125. We said:

> "We do not hold that a landlord's retention in the lease of some control over particular matters in the leased premises is, standing alone, a sufficient basis to impose a duty upon the landlord which is owed to a guest on the premises. This Court has employed a balancing test to determine whether a duty of reasonable care should be imposed in particular circumstances. '[U]ltimately, the determination of whether a duty should be imposed is made by weighing the various policy considerations and reaching a conclusion that the plaintiff's interests are, or are not, entitled to legal protection against the conduct of the defendant.' In the instant case, the various policy considerations that need to be weighed are the general understanding that a tenant is primarily in control of the leased premises and the sanctity of a tenant's home, including her ability generally to do as she sees fit within the privacy thereof, against the public safety concerns of permitting that same tenant to harbor an extremely dangerous animal that will foreseeably endanger individuals inside and outside the walls of the leased premises, the degree of control maintained by the landlord, the landlord's knowledge of the dangerous condition, and the landlord's ability to abate the condition. We, like the majority of courts addressing this issue [landlord's liability for pit bull attacks] in other states, believe that the balance should be struck on the side of imposing a duty on the landlord which is owed to guests on the premises."

*Id.* at 565–66, 719 A.2d at 129 (Citations omitted).

The only way the majority can reach their desired result is to cobble together the line of cases in Maryland imposing a

duty for liability for physical harm which occurred in the common areas with the line of cases finding liability for demised premise damage resulting from a cause originating in the common area. *See* maj. op. at 23. This is a novel theory, unsupported by any authority or case law in the country.

Some courts have found that, based on a voluntary assumption theory, a landlord's duty arises from an express or implied promise to provide security. *See e.g., Phillips v. Chicago Housing Authority,* 89 Ill.2d 122, 59 Ill.Dec. 281, 431 N.E.2d 1038, 1041 (1982) (citing *Nelson v. Union Wire Rope Corp.,* 31 Ill.2d 69, 199 N.E.2d 769, 774 (1964)). Section 324A of the Restatement (Second) of Torts (1965) states as follows:

"One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

(a) his failure to exercise reasonable care increases the risk of such harm, or

(b) he has undertaken to perform a duty owed by the other to the third person, or

(c) the harm is suffered because of reliance of the other or the third person upon the undertaking."

Section (c) has been interpreted to mean that "[w]here the reliance of the other, or of the third person, has induced him to forego other remedies or precautions against such a risk, the harm results from the negligence as fully as if the actor had created the risk." *See Pippin v. Chicago Housing Authority,* 78 Ill.2d 204, 35 Ill.Dec. 530, 399 N.E.2d 596, 600 (1979) (quoting Restatement (Second) of Torts § 324A cmt. e). Without relying explicitly upon § 324A, the majority appears to find a duty on the landlord's part based upon the landlord having provided for outdoor lighting in the common area and the failure to maintain the lighting. *See* maj. op. at 28.

The question of whether a landlord's provision of security measures can give rise to liability for harm to tenants, within

the demised premises, that results from a failure to maintain those measures is one of first impression in the State. Other states have addressed the question, with varying results. *See, e.g., Walls v. Oxford Mgmt. Co.,* 137 N.H. 653, 633 A.2d 103, 106–07 (1993) ("[A] landlord who undertakes, either gratuitously or by contract, to provide security will thereafter have a duty to act with reasonable care."); *Sharp v. W.H. Moore, Inc.,* 118 Idaho 297, 796 P.2d 506, 509 (1990) ("A landlord, having voluntarily provided a security system, is potentially subject to liability if the security system fails as a result of the landlord's negligence."); *Feld v. Merriam,* 506 Pa. 383, 485 A.2d 742, 747 (1984) ("[A] landlord may ... incur a duty voluntarily or by specific agreement if to attract or keep tenants he provides a program of security."). *But see, e.g. Hall v. Rental Mgmt., Inc.,* 323 Ark. 143, 913 S.W.2d 293, 297 (1996) (holding that a landlord's implementation of "modest, conscientious measures" such as safety lighting, evening patrols, and communication with residents regarding suspicious activities, "do not rise to such a level that [the landlord] assumed a duty to protect its tenants from criminal attacks by third parties").

In several states where the duty to maintain security features external to the demised premises gives rise to liability for harm to tenants, the duty imposed is limited to the extent of the security measures undertaken. *See Walls,* 633 A.2d at 107; *Feld,* 485 A.2d at 747 ("A tenant may rely upon a program of protection only within the reasonable expectations of the program. He cannot expect that a landlord will defeat all the designs of felonry. He can expect, however, that the program will be reasonably pursued and not fail due to its negligent exercise."). In *Funchess v. Cecil Newman Corp.,* 632 N.W.2d 666 (Minn.2001), the Supreme Court of Minnesota noted:

"We are not inclined to establish a rule that would discourage landlords from improving security. Transforming a landlord's gratuitous provision of security measures into a duty to maintain those measures and subjecting the landlord to liability for all harm occasioned by a failure to

maintain that security would tend to discourage landlords from instituting security measures for fear of being held liable for the actions of a criminal. This limitation on the extent of the duty to maintain security measures leads us to conclude that any duty [the landlord] might have had is not of the type to give rise to liability for Haynes' death."
*Id.* at 675.

Courts have generally held, based on public policy, that it is not fair to impose upon the landlord a duty to protect the tenant from criminal activity within the demised area. *See Bartley v. Sweetser,* 319 Ark. 117, 890 S.W.2d 250, 252 (1994); R. Schoshinski, *American Law of Landlord and Tenant,* 217 (1980). The reason for the rule has been stated as follows:

" 'Judicial reluctance to tamper with the common law concept of the landlord-tenant relationship, the notion that the act of a third person in committing an intentional tort or crime is a superseding cause of harm to another . . .; the often times difficult problem of determining foreseeability of criminal acts; the vagueness of the standard which the landlord must meet; the economic consequences of the imposition of the duty; and the conflict with public policy allocating the duty of protecting citizens from criminal acts to the government rather than the private sector.' "

*Id.* (quoting *Kline v. 1500 Massachusetts Ave. Apartment Corp.,* 439 F.2d 477, 481 (D.C.Cir.1970)). Although this Court has been willing to consider changes to the common law, recognizing that the law is not static, the other reasons set forth by Professor Schoshinski are persuasive. This view is consistent with the Restatement (Second) of Torts § 448 (1965), which reads as follows:

"The act of a third person in committing an intentional tort or crime is a superseding cause of harm to another resulting therefrom, although the actor's negligent conduct created a situation which afforded an opportunity to the third person to commit such a tort or crime, unless the actor at the time of his negligent conduct realized or should have realized the likelihood that such a situation might be created, and that a

third person might avail himself of the opportunity to commit such a tort or crime."

Thus, foreseeability of a risk of harm is the primary basis for imposing a duty, but, the question is not simply whether a criminal event is foreseeable, but whether a *duty* exists to take measures to guard against it. *See Smith v. Dodge Plaza*, 148 Md.App. 335, 346–55, 811 A.2d 881, 888–93 (2002). Although the foreseeability of a plaintiff's injury is important in the determination of whether a duty exists, the imposition of a duty does not depend upon foreseeability alone. As Dean Prosser stated, "[I]t should be recognized that 'duty' is not sacrosanct in itself, but is only an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection." Prosser and Keeton on Torts § 53 (5th ed.1984). Whether a duty exists depends on the relationship of the parties, consideration of the likelihood of injury and nature of the risk, the public interest in the proposed solution, the burden to guard against it, and the consequences of placing that burden upon the defendant.[6] *See Rosenblatt v. Exxon*, 335 Md. 58, 77, 642 A.2d 180, 189 (1994); *Ashburn v. Anne Arundel County*, 306 Md. 617, 627–28, 510 A.2d 1078, 1083 (1986). Writing for the panel in *Dodge Plaza*, Judge Rodowsky applied the balancing approach set out in *Matthews*, "under which the foreseeable risk is compared to a number of factors, including 'the landlord's ability to abate the condition.'" *Dodge Plaza*, 148 Md.App. at 351, 811 A.2d at 891 (quoting *Matthews*, 351 Md. at 566, 719 A.2d at 129).

Whether the landlord retains responsibility for actions which occur within the leased premises under other circumstances is not an issue before this Court. Those circumstances have yet to be defined. *See, e.g., Frances T. v. Village Green Owners Ass'n*, 42 Cal.3d 490, 229 Cal.Rptr. 456, 723

---

**6.** Were we to hold that the failure to maintain, or install the lighting subjects the landlord to liability for all violent crime committed by a third party within the tenant's apartment and in a location beyond the control of the landlord, we would discourage the landlord from initiating extra lighting for fear of being held liable for the actions of a criminal.

P.2d 573 (1986) (finding allegation of negligence sufficient based on condominium association's duty to provide exterior lighting, where tenant/victim made repeated requests to improve lighting for security, installed additional lighting herself, and was ordered by the association to remove her additional lighting). What is clear to me, and is before this Court, is that the failure to maintain adequate lighting in the common area does not make a murder within the leased premises foreseeable. The Court of Special Appeals rejected plaintiff's arguments. Judge Arrie Davis, writing for the panel, cogently reasoned as follows:

> " 'The basic elements necessary for a cause of action in negligence "are a duty or obligation which the defendant is under to protect plaintiff from injury, a failure to discharge that duty, and actual loss or injury to the plaintiff proximately resulting from that failure." ' *Scott v. Watson,* 278 Md. 160, 165, 359 A.2d 548 (1976)(quoting *Peroti v. Williams,* 258 Md. 663, 669, 267 A.2d 114 (1970)). A landlord is obligated to use reasonable and ordinary care to keep common areas safe. *Id.* Because a landlord is not an insurer of the safety of its tenants, he or she is not ordinarily liable to a tenant or guest of a tenant for injuries from a hazardous condition in the leased premises that comes into existence *after* the tenant has taken possession. *Marshall v. Price,* 162 Md. 687, 161 A. 172 (1932). This rule also applies to criminal acts of third parties; 'there is no special duty imposed upon the landlord to protect his [or her] tenants against crimes perpetrated by third parties on the landlord's premises.' *Scott,* 278 Md. at 166, 359 A.2d 548. However, when it can be illustrated that the landlord had knowledge of increased criminal activity on the premises, a duty is imposed on the landlord to undertake reasonable measures to keep the premises secure.[7] *Id.* at 165, 359 A.2d 548."

---

7. The duty to keep "the premises secure" in this context means the common areas, not the demised premises.

*Hemmings,* 144 Md.App. at 317–18, 797 A.2d at 855. The Court of Special Appeals concluded:

"From the facts presented, a fact finder would be constrained to conclude that there could be no showing that appellees' failure to maintain the common areas was the proximate cause of the fatal event. Consequently, the grant of summary judgment was proper."

*Id.* at 323–24, 797 A.2d at 859. I agree with the Court of Special Appeals and would affirm.

Accordingly, I respectfully dissent. Judge Cathell and Judge Harrell have authorized me to state that they join in this dissenting opinion.

Dissenting opinion by CATHELL, J. in which HARRELL, J. joins.

For the reasons stated in the dissents in *Matthews v. Amberwood Associates Limited Partnership, Inc.,* 351 Md. 544, 719 A.2d 119 (1998), I also dissent in the present case. The majority, in my view, now makes a landlord an insurer against crime. Judge Harrell authorizes me to state that he joins in this dissent.